Elena Ruth SASSOWER and Doris
L. Sassower, Plaintiffs,

v.

Katherine M. FIELD, Curt Haedke, Lilly
Hobby, William Iolonardi, Joanne Iolo-
nardi, Robert Rifkin, individually, and
as Members of the Board of Directors
of 16 Lake Street Owners, Inc., Hale
Apartments, DeSisto Management, Inc.,
16 Lake Street Owners, Inc., and Roger
Esposito, individually, and as an officer
of 16 Lake Street Owners, Inc., Defen-
dants.

No. 88 Civ. 5775 (GLG).

United States District Court,
S.D. New York.

Aug. 12, 1991.

Elena Ruth Sassower, pro se.

Doris L. Sassower, pro se.

Peter Grishman, Pleasantville, N.Y., Eli Vigliano, Yonkers, N.Y., Former Counsel, for plaintiff Doris L. Sassower.

Bleakley Platt & Schmidt, White Plains, N.Y. (James Glatthaar, of counsel), for former co-plaintiff John McFadden.

Diamond, Rutman & Costello, New York City (Mariann Wetmore, of counsel), for defendant Roger Esposito.

Lawrence J. Glynn, White Plains, N.Y., for defendants Katherine M. Field, Curt Haedke, Lilly Hobby, William Iolonardi, Joanne Iolonardi, Robert Rifkin, Individually and as Members of the Board of Directors of 16 Lake Street Owners, Inc., and 16 Lake Street Owners, Inc.

Dennis T. Bernstein, Tuckahoe, N.Y., for defendant Hale Apartments.

Marshall, Conway & Wright, P.C., New York City (Jeffrey A. Marshall, of counsel), for defendant DeSisto Management, Inc.

## OPINION

GOETTEL, District Judge:

Following a quick jury verdict in their favor, after several years of incredibly fractious litigation and the denial of the plaintiffs' motion for a new trial, all of the defendants now move for attorneys' fees and sanctions pursuant to: (1) Rule 11 of the Federal Rules of Civil Procedure; (2) Federal Fair Housing Act, 42 U.S.C. § 3613(c); (3) 28 U.S.C. § 1927; and the general powers of the court.

### FACTS [1]

This contentious litigation arises from a relatively simple set of facts. Defendant 16 Lake Street Owners, Inc. is the owner of the real property and cooperative apartment building located at 16 Lake Street, White Plains, New York. Defendants Field, Hobby, Haedke, W. Iolonardi and Rifkin, constituting the Board of Directors, are authorized to act upon applications to purchase stock and the corresponding proprietary lease as well as applications to sublet apartments in the building. John McFadden is the proprietary lessee for apartment 2C of the 16 Lake Street building and is the owner of 548 shares of stock in 16 Lake Street Owners, Inc.[2]

By contract dated October 29, 1987, John McFadden agreed to transfer his 548 shares of stock in 16 Lake Street Owners, Inc. and the proprietary lease for apartment 2C, to plaintiffs Elena Ruth Sassower and Doris L. Sassower. After the agreement was signed, Elena Sassower and her

---

1. The facts of this action have been set forth in some of the numerous prior decisions in this case. Rather than go through it again, we will simply repeat the facts from our decision dated September 5, 1990. *See Sassower v. Field,* 752 F.Supp. 1182 (S.D.N.Y.1990).

2. John McFadden, formerly a plaintiff in this action, voluntarily discontinued his claims against the defendants by order signed by the court on June 15, 1990.

father, George Sassower, took possession of the apartment as their principal residence in accordance with the contract terms. They remain in possession to date. In January 1988, the plaintiffs applied for a loan commitment to purchase the stock shares and proprietary lease for apartment 2C and received that commitment in April 1988. In May 1988, the plaintiffs were interviewed by certain members of the admissions committee of 16 Lake Street Owners, Inc. By letter to the defendant DeSisto Management, Inc., the managing agent for 16 Lake Street Owners, Inc., dated May 19, 1988, the Board of Directors denied the plaintiffs' application to purchase the stock shares and proprietary lease for apartment 2C from John McFadden. By letter dated May 20, 1988, DeSisto Management informed the plaintiffs of this decision. The plaintiffs and John McFadden subsequently requested that the Board of Directors reconsider its decision. On June 14, 1988, the Board of Directors unanimously voted to deny the plaintiffs' request for reconsideration of the original decision disapproving the purchase application.

In August 1988, the plaintiffs commenced this lawsuit alleging eight causes of action against the various defendants. Those actions may be summarized as follows: violations of the federal Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1982); violations of the federal Civil Rights Act, 42 U.S.C. § 1983 (1982); violations of New York Human Rights Law, N.Y. Exec. Law § 296(5)(a) (1982); violations of New York Civil Rights Law, N.Y. Civ. Rights Law § 19–a (1982); failure to comply with the provisions of the corporate by-laws and the proprietary lease governing transfers; breach of the duty of good faith; intentional infliction of emotional distress; unequal treatment of shareholders; breach of fiduciary duty; and failure to comply with its own policies. The plaintiffs' allegations of discrimination, contained primarily in the first cause of action, are based on their contention that the defendants' decision to deny their application to purchase the shares and proprietary lease for apartment 2C was made on account of their status as single, Jewish women.

## PLAINTIFFS' OBJECTIONS TO LIABILITY FOR PAYMENT OF ATTORNEYS' FEES

Before addressing the merits of the motions, a number of objections made to the propriety of giving defendants any attorneys' fees or sanctions must be considered. First, plaintiffs contend that they may not be held responsible for any sanctions or attorneys' fees under any of the foregoing provisions, claiming that the defendants are not the real party in interest to make such an application. They argue that since the cooperative, 16 Lake Street Owners, Inc., had insurance, and since the insurer has paid the cost of most of the defendants' attorneys, in whole or in part, the insurance company, State Farm Mutual, is the real party in interest and, therefore, defendants cannot seek such costs. The argument is absurd. Most defendants who are sued have insurance and, if sued on a matter within the scope of coverage, the insurance company pays the attorneys selected to represent them. However, the attorney's client is the insured and not the insurance company. When an insured party prevails under a circumstance allowing the recovery of sanctions or fees, it is the insured who makes the application even though the monies may ultimately revert to the insurance carrier as reimbursement for fees paid.

Plaintiffs cite only one case, *United States v. Aetna Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), for their novel proposition that the carrier must make the application. That case concerned the limitation in the Federal Tort Claims Act, 31 U.S.C. § 203, against assigning claims against the United States. The Court held that if an insurance company pays its insured's claim it becomes subrogated to the claim and may sue in its own name without violating the Federal Tort Claims Act. 338 U.S. at 380–81, 70 S.Ct. at 215–16. Clearly, that case is no authority for the proposition that insured defendants have no right to recover legal fees or sanctions when their defense had been paid by the insurer.

Plaintiffs also argue that the attorneys, having agreed to work at a particular fee specified by their client's insurer, may not seek any greater sum even if the insurer is only paying a part of the fee. Obviously, the hourly fee which the attorney agrees to accept from an insurance carrier is something to be considered in determining an appropriate attorney's fee. However, it is not conclusive on the question of what hourly billing rate a prevailing attorney is entitled to. *Cf. Tolliver v. Amici*, 800 F.2d 149, 152 (7th Cir.1986) (granting reasonable attorney's fees to prevailing plaintiff who had agreed to contingency fee arrangement).

An additional argument made by the plaintiffs is that neither attorney's fees nor sanctions may be awarded absent a "plenary and jury determination as a matter of right ... with confrontation and subpoena rights." Plaintiffs' Memorandum of Law at 15, citing *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). *Tull* concerned the right to a jury trial in an action brought by the government, seeking penalties and injunctive relief under the Clean Water Act. The penalties sought in that case bear no relationship to the type of sanctions and fees sought here. Here, the defendants' application does not arise out of a case or controversy but instead rests upon the inherent power of the court to manage its own proceedings and control the conduct of those appearing before it. The determination of liability therefore is vested in the sound discretion of the court and no jury trial is necessary. Moreover, *Tull* holds that the Seventh Amendment does not guarantee a jury trial to assess civil penalties and that such assessments may be done by the trial judge, which is directly contrary to the plaintiffs' position. *Id.* at 427, 107 S.Ct. at 1840. The plaintiffs' reliance on *Lytle v. Household Manufacturing, Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990), for the proposition that they are entitled to a jury trial is similarly misplaced. That case, too, has nothing to do with sanctions or attorneys' fees but, instead, addresses the respective responsibilities of the judge and jury in actions seeking both equitable and legal relief.

Plaintiffs maintain that it is premature for the defendants to be making this application and that it should await decision of their appeal. Defendants have received final judgment following a full trial on the merits, motions requesting a new trial and the recusal of the trial judge have been denied, and the litigation is now concluded. The application for attorneys' fees and sanctions is thus appropriate at this time. Indeed, to defer it until after the appellate decision could result in piecemeal appeals.

Finally, plaintiffs and their various attorneys contest their liability for fees and sanctions under each of the statutes and rules upon which the defendants rely. These will, therefore, be considered separately.

## A. *The Fair Housing Act*

■ At the time the complaint in this action was first filed, the Federal Fair Housing Act, 42 U.S.C. § 3613(c), provided that only a prevailing plaintiff could recover his attorneys' fees. A month later, on September 13, 1988, the Act was amended to provide for recovery of fees by the "prevailing party," effective six months thereafter. *See* 42 U.S.C. § 3613(c)(2) (West Supp.1991). When a decision involves a procedural matter such as attorneys' fees or sanctions, a court normally applies the law in effect at the time it renders its decision, even if a change in the law occurs after trial and during the pendency of an appeal, provided that such application would not work a manifest injustice. *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

■ Plaintiffs argue that it would be unjust to retroactively apply the amended attorneys' fee section of the Fair Housing Act. However, the plaintiffs amended their complaint twice after the new provision became effective, adding new claims of economic loss and emotional distress and seeking compensatory damages. They carried the case forward to an ultimate trial despite warnings that the act could result

in their being responsible for fees. Moreover, the original complaint, when filed, included a federal civil rights claim under which attorneys' fees are payable to the prevailing party. (These counts were dropped before trial.) *See* 42 U.S.C. §§ 1983, 1988. Given that plaintiffs were subject, in any case, to attorneys' fees when their complaint was filed, we find nothing manifestly unjust in holding the plaintiffs responsible, under the Fair Housing Act, for the *reasonable* attorneys' fees paid to defense counsel *after* the amendment became effective.

Plaintiffs also argue that, regardless of the language of the statute, it should be construed to require the payment of attorneys' fees by a losing plaintiff only if their action is totally meritless. Even were that the rule of law, we would find plaintiffs responsible for fees to the prevailing party since the action *was* totally meritless, as described more fully below.

B. *Rule 11 of the Federal Rules of Civil Procedure*

■■■ Rule 11 states, in relevant part, that:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and warranted by existing law ... that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The purpose of Rule 11 sanctions is to deter the filing of frivolous and abusive actions. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989). Un-

like § 3613 of the Fair Housing Act, Rule 11 is not intended to be a fee shifting device. Instead, the Rule was designed to deter both attorneys and clients from abusing the judicial process. Therefore, Rule 11 sanctions can be assessed against either an attorney or a client, or both.

This case was commenced by Doris and Elena Sassower who claimed that the co-op board rejected their application for purchase because they were Jewish unmarried females.[3] Plaintiffs were aware that there were other Jews living in the building and that, indeed, the sponsors of the co-op were Jewish. They also knew, or certainly could have found out had they made inquiry, that there were other single females in the building. At the time the application was rejected, they were advised that the primary objection to the purchase concerned George Sassower, formerly the husband of Doris Sassower, and the father of Elena Sassower.[4]

The record is clear that the neighbors objected to George Sassower, who was the primary occupant of the apartment. Testimony at trial revealed that he was arrested at the apartment. (We believe that the arrest was for the illegal practice of law.) After his arrest, which was witnessed by some of the building residents, Elena Sassower asked some of the Board members if the arrest would impact their application. Those queried politely said that that event would not influence their feelings about the application, but, as it turned out, there were additional objections to George Sassower lurking in the hallways and smoking cigars. Another problem with the application was that the prospective purchasers were Doris Sassower, her son-in-law (both of whom had assets but did not intend to reside in the building) and Elena Sassower, who has at times lived in the apartment but lacked personal assets to make the pur-

---

**3.** John McFadden, who originally was a plaintiff, was the seller of the apartment and purportedly lost his opportunity to complete the sale to the Sassowers as a result of this alleged discrimination.

**4.** George Sassower is a disbarred attorney. George Sassower has been held in contempt on several occasions. He took to filing totally friv-

olous and demented actions against judges throughout this area. When he was barred from filing any further such frivolous actions in this and surrounding districts, as well as appeals to the Court of Appeals for the Second Circuit, he simply shifted his activities to other circuits. These actions are routinely dismissed.

chase.[5] A suspicion was held by the Board members that the apartment was primarily intended as a residence for George Sassower who apparently lacks assets and viable means of support and had received no equitable distribution in the divorce from Doris Sassower.[6] As the evidence at the trial clearly indicated, there were a number of other considerations which made the application for purchase unacceptable to the 16 Lake Street owners, but none of them had anything whatever to do with the fact that Doris and Elena Sassower were Jewish or currently unmarried. The action was instituted and carried forward at the instigation of Doris Sassower, who was then a practicing attorney herself,[7] for purely monetary gain.

■ Plaintiffs make several arguments against the application of sanctions to them. First, they argue, citing *Business Guides v. Chromatic Communications,* — U.S. —, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991), that sanctions can be invoked only against the person signing the pleading, motion or paper involved. *Business Guides* concerned a situation in which the corporate client had signed papers in a motion for a temporary restraining order and preliminary injunction. The lower courts had sanctioned the client upon finding that these papers had been filed without reasonable inquiry by the party as required by Rule 11. (The issue of whether the attorneys should have detected the absence of reasonable inquiry was mooted by the bankruptcy filing of the firm involved.) The Supreme Court held, unequivocally, that Rule 11 applies to represented parties although it did so in the context of a represented party who had signed certain papers. It noted, however, that the Court was not "convinced that, as a policy matter, represented parties should not be held to a reasonable inquiry standard. Quite often it

is the client, not the attorney, who is better positioned to investigate the facts supporting a paper or pleading. This case is a perfect example." *Business Guides,* 111 S.Ct. at 932. The Court then went on to hold that parties, whether proceeding *pro se* or when represented by counsel, are held to the same objective standard of reasonableness and are bound to make a reasonable inquiry into the facts and the law when signing documents to be submitted to the court. *Id.* at 933.

We have a hybrid situation in this case. Both of the plaintiffs were represented at one time or another by several attorneys or trial counsel. In addition, both of them, at times, appeared *pro se.* During the course of this lengthy proceeding, both of them signed numerous documents. Moreover, both directed the actions of the attorneys and trial counsels who were retained. We believe that under these circumstances the plaintiffs, both as represented parties and as *pro se* litigants, may be held responsible for Rule 11 sanctions should such be appropriate. To the extent that their activities may fall outside the ambit of Rule 11, plaintiffs can clearly be sanctioned under the inherent power of the court to monitor its own proceedings and to control the conduct of those who appear before them. *Chambers v. NASCO, Inc.,* — U.S. —, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Indeed, in *Chambers v. NASCO, supra,* the Court determined that the petitioner, both when represented by counsel and when appearing *pro se,* took acts intended to degrade the judicial system and unreasonably and vexatiously multiplied proceedings and upheld the district court's imposition of sanctions. It is our view that the plaintiffs here were guilty of that, as well. (*See* discussion of sanctions under 28 U.S.C. § 1927 below.)

---

5. At one point during this litigation, she applied for assignment of counsel, claiming to be indigent.

6. The fact that George Sassower has no assets has enabled him to file his numerous scurrilous actions and claims since there are no assets from which to effect a recovery from him. Testimony at trial revealed that Mrs. Sassower re-

sided in a two million dollar mansion and that Elena is an occasional resident there.

7. Mrs. Sassower has recently been suspended from the practice of law pending an examination by a qualified medical expert to determine whether she is "incapacitated from continuing to practice law." *See Matter of Sassower,* N.Y.L.J. (June 21, 1991).

No motion has been made seeking sanctions against the attorneys who served merely as trial counsel for the plaintiffs, David B. Cohen, who appeared of counsel to Eli Vigliano, who was representing Mrs. Sassower, and Jeremy Morley, who was plaintiffs' trial counsel. However, sanctions are sought against their counsel of record, Peter Grishman and Eli Vigliano and also McFadden's attorney, James Glatthaar. Each of them argues that he signed only certain of the papers submitted in the action and did so upon a belief that the information being supplied by the plaintiffs was accurate. We will consider the arguments of the attorneys separately.

Plaintiffs argue that since sanctions are not sought against trial counsel Cohen and Morley, none can be assessed against them. This is simply incorrect. With respect to Cohen, who never appeared as counsel of record, his activities during discovery might conceivably have been the basis for the seeking of sanctions. However, since he was only of counsel to Vigliano, and withdrew after a few months reportedly complaining of the hardships of dealing with the Sassowers, sanctions against him would be excessive.

As to Morley, we see no basis for sanctions whatsoever. Once he became trial counsel, he attempted to trim back the excesses of the Sassowers to the extent possible. He also tried the case in a reasonable and appropriate manner despite the occasional objections of his clients. (Indeed, to this date, they object to the manner in which he tried the case, blaming their failure to prevail on him rather than the lack of merit in the case.)

C. *Sanctions Pursuant to Title 28 U.S.C. § 1927*

Title 28 U.S.C. § 1927 (1988) provides:
Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

The Sassowers pursued this litigation as if it was a holy war and not a court proceeding, managing these proceedings in a fashion that vexatiously, wantonly and for oppressive reasons increased the legal fees enormously. *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986), *cert. denied sub nom.*, *Suffolk County v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). They made several unsupported bias recusal motions based upon this court's unwilling involvement in some of the earlier proceedings initiated by George Sassower. *See, e.g.*, *Affeldt v. Carr*, 111 F.R.D. 337 (N.D.Ohio 1986) (Rule 11 sanctions imposed on attorney who filed recusal motions in an attempt to interfere with proceedings), *aff'd* 827 F.2d 769 (6th Cir.1987). There were continual personal attacks on the opposing parties and counsel.[8] (*See* discussion of plaintiffs' latest motion for a new trial below.) In virtually every instance where a court ruling was not satisfactory to them, plaintiffs routinely made a motion to reargue. In addition, the plaintiffs filed two improper interlocutory appeals which were subsequently withdrawn.[9] This, too, is improper. *Shields v. Shetler*, 120 F.R.D. 123 (D.Colo. 1988). Finally, they have now filed a mammoth motion for a new trial and sanctions against opposing counsel which seeks to reargue virtually every aspect of the litigation for the third time. (*See* discussion below.) Imposition of sanctions under § 1927 requires a clear showing of bad faith. *Oliveri v. Thompson*, 803 F.2d at 1273. In this instance, this court has no

---

**8.** Typical of this was Doris Sassower's statement to opposing counsel during her deposition: "Again, are you crazy? You are totally so out of order and so improper. You are totally an unprofessional, despicable individual." Deposition of Doris Sassower (May 16, 1990) at 102–103.

**9.** Defendants waived any claim to attorneys' fees as to one of these appeals. Because we believe that the issue of an improper appeal is a matter more properly in the hands of the appellate court, we do not consider costs in that regard.

hesitation in finding that the plaintiffs acted in bad faith,[10] vexatiously and unreasonably.[11]

More particularly, we look to the plaintiffs' behavior with respect to Doris L. Sassower's own discovery. The discovery in this matter, an onerous task, was supervised by now retired Magistrate Judge Joel J. Tyler. By a report and recommendation dated March 27, 1990, he recommended dismissal of her complaint because of her egregious failure to make discovery as directed by the court. In response thereto, she filed a motion for an order disaffirming the report and remitting the matter to the Magistrate Judge for a ruling on the discovery practices of the defendants. Since there was no procedural basis for such a motion, we treated it as simply opposition to the Magistrate Judge's recommendation and held, in our memorandum decision dated April 19, 1990:

> Essentially, her objections attempt to argue the underlying facts and continues to claim that it would be a danger to her health to be deposed in this case. We find it very strange that filing motions, conducting depositions, negotiating a change in the escrow money status on the contract at issue, and, in general, performing the functions of an attorney, are apparently not threatening to her health, but that to appear as a witness answering questions at a deposition purportedly would be. According to the Gannett Westchester newspaper of April 12, 1990 (page 11), there have been contempt proceedings pending against Doris Sassower in Westchester County Su-

preme Court for about a half of a year. They have had to be adjourned three times because of her claim of ill health. It is not surprising that she should feel under some stress and prefer not going forward with that proceeding. However, she has been very vigorous in her litigation of this case.

Doris L. Sassower further argues that the report could not be adopted because a hearing is legally required before such an order could issue. However, since the hearing would concern her physical condition and she has foreclosed inquiry of her doctors on that subject, we find this argument unpersuasive. She also opposes the magistrate's alternative recommendation that if the action not be dismissed she should be directed to peremptorily appear for a deposition with no further excuses to be accepted. She argues that her subsequent failure to appear for a deposition would have to be ignored unless it was "willful or inexcusable" and, since she claims her mental and physical state prohibits her appearance, that would not be likely to come to pass.

\* \* \* \* \* \*

It is patently clear that Doris L. Sassower has been guilty of attempting to manipulate the court by appearing as attorney on those matters which could assist her case while refusing to be deposed herself, claiming health problems. We were compelled at an earlier time to allow Doris L. Sassower to appear *pro se* and to relieve her attorney because of the law in this Circuit, even though we

---

**10.** Among other things, the plaintiffs attempted to communicate directly with the defendants rather than through counsel in order to force through their settlement demands.

**11.** We note that we are not the first court to reach such a conclusion concerning the litigating tactics of Doris Sassower. Justice Samuel G. Fredman, of the Supreme Court of the State of New York, County of Westchester, in a contempt proceeding concerning Doris L. Sassower, described what he terms a veritable nightmare experience:

> From the relatively simple molehill of potential issues which could possibly arise from such conduct, Sassower has created a moun-

tain of legal, factual and even political abracadabra. Her actions have taken an inordinate amount of this Court's time and tested its patience beyond the wildest imagination.

*Breslaw v. Breslaw*, Slip Op., Index No. 22587/86 (June 24, 1991), at 2. Elsewhere in that decision he speaks of

> months of actual court time spent in permitting Sassower to preserve her rights by trick and chicanery beyond the concept of most any lawyer who practices in our courts. She is indeed sui generis in her actions, but she who litigates by the stiletto must face its rebound when it falls the other way.

*Id.* at 12.

could foresee the type of manipulation that has subsequently occurred.

This court then noted that since George and Elena Sassower had continued to occupy the apartment in question and that the dismissal of Doris Sassower's complaint would accomplish nothing since her daughter, Elena, could continue the action, no effective sanction would result from accepting the Magistrate Judge's recommendation.[12] We observed, *inter alia*, that the circumstances appeared to warrant monetary sanctions but in light of the fact that attorneys' fees could be awarded at the conclusion to the prevailing party, the matter could await the end of the action.

In addition to her recalcitrance in her own deposition, Doris Sassower assisted her friend and attorney, Eli Vigliano, in conducting incredibly harassing depositions of certain of the defendants. These will be discussed in more detail in the section below concerning Mr. Vigliano.

 The principal opposition offered by the plaintiffs is that § 1927 is limited only to attorneys and should not be applied to an attorney who appears *pro se*. We do not agree with that assertion. The section applies to attorneys "or another person admitted to conduct cases." The plaintiffs sought and were granted permission to proceed *pro se*. As the Ninth Circuit stated in a case involving a *pro se* litigant who was not an attorney:

> Section 1927 sanctions may be imposed upon a pro se plaintiff, despite [plaintiff's] protestations to the contrary. *See, e.g., Woods v. Santa Barbara Chamber of Commerce, Inc.*, 699 F.2d 484, 485–86 (9th Cir.1983) (cert. denied), 465 U.S. 1080, 104 S.Ct. 1445, 79 L.Ed.2d 765 (1984).

**12.** We did, however, preclude Doris Sassower from testifying at trial. Subsequently, she appeared for deposition and was allowed to testify at trial.

**13.** Indeed, to quote a distinguished state colleague:

> Sassower is accustomed to "getting away with murder" in the Court System; there is not a single one of my colleagues who would go to bat for her or accept her word; this is also

*Wages v. I.R.S.*, 915 F.2d 1230, 1235–1236 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 986, 112 L.Ed.2d 1071 (1991). Additionally, we note that § 1927 sanctions can be imposed on an attorney and client jointly and severally when they are equally blameworthy with respect to the dilatory and vexatious conduct of the trial. *Kendrick v. Zanides*, 609 F.Supp. 1162, 1173 (N.D.Cal.1985). Finally, even if we were to take the view of the Fifth Circuit that § 1927 applies only to attorneys, sanctions can be imposed on both plaintiffs under the inherent power of the court because of their tactics of delay, oppression and harassment. *Chambers v. NASCO, supra*, 111 S.Ct. 2123.

## THE PARTIES AND ATTORNEYS RESPONSIBLE FOR ATTORNEYS' FEES AND SANCTIONS

### The Sassowers

Having determined that the circumstances of this case warrant sanctions, the culpability of the various parties must now be assessed. As indicated in the earlier sections, we believe that both plaintiffs can be held responsible for all of the types of sanctions sought. An argument can be made that to the extent that the sanctions such as Rule 11 are intended to deter plaintiffs rather than reimburse the defendants and to control the conduct of the litigants, there is little hope of them having any effect upon Doris Sassower. While she is not in the same league as her former husband, George Sassower, when it comes to frivolous litigation she has, nevertheless, been a litigant in a large number of suits. Moreover, sanctions imposed by courts in earlier litigations did not restrain the actions by Doris Sassower in this case.[13]

true as to her confreres at the Bar, very few of whom, if any, would raise a finger in her defense. She has walked to the edge of the ledge of contempt and/or sanction, including for this very same offense, on prior occasions.... I invite the Grievance Committee to study the record of this proceeding to determine if someone who so misstates and mistreats the American legal system ought to be afforded the opportunity to continue to harass the weak and the downtrodden as she has evidently done, time and time again.

Nevertheless, for whatever deterrent effect it may have, sanctions are appropriate against her. ·

As to Elena Sassower, because of her relative youth (she is in her 30's) and the fact that she has not been an attorney admitted to practice, the facts are not so egregious. While we do not believe that she is financially able to respond in the payment of attorneys' fees and sanctions,[14] so that these costs will probably have to be borne solely by her mother, we find it nevertheless appropriate to administer those costs against her jointly with her mother.

Peter Grishman

Peter Grishman was the attorney for both of the Sassowers when this action was instituted. As an attorney, he is not responsible under the Fair Housing Act for fees. In any case, Grishman withdrew from the case at about the time the amendment to the Act allowing prevailing parties to recover became effective.[15]

With respect to administering sanctions under Rule 11 and § 1927, the only serious charge made against Grishman by defense counsel concerns an attempt by the plaintiffs themselves to settle the case directly with the defendants, going around defense counsel. Part of plaintiffs' tactics was use of a letter written to defense counsel by Grishman. He states, however, that he was not personally responsible for the for-

warding of this letter to the defendants. Grishman defends his drafting of the complaint by arguing it was based on information provided to him by his clients and the co-plaintiff. He also contends that this court's denial, in part, of the defendants' motion for summary judgment on the grounds that plaintiffs had set forth a *prima facie* case against certain of the defendants, demonstrates that it cannot be said that his actions were to any degree improper.

The fact that summary judgment was not granted in favor of those defendants who made the decision not to accept the Sassowers as owners, does not, as Grishman argues, and as others have contended, show that there was colorable merit to the case. The plaintiffs fell into a protected class, and at least cumulatively had the assets to complete the purchase. They claimed that their rejection was based on anti-Semitism and some peculiar bias against unmarried females. The question of the 16 Lake Street Owners Board's motives was not a matter that could be resolved on papers because credibility was in issue. Thus, a trial was needed. However, at its conclusion, the jury, as finders of fact, rapidly resolved the credibility issues against the plaintiffs. Nevertheless, we do not see that the actions of attorney Grishman merit the invocation of Rule 11 sanctions or § 1927 sanctions.[16]

Eli Vigliano

Eli Vigliano is an attorney with an office

*Breslaw v. Breslaw, supra,* at 14; *see also Muscolino v. Muscolino,* Supreme Court, Westchester County, Index Number 2252/1986.

**14.** Midway through the litigation, Elena Sassower asked for the appointment of counsel, since she claimed to be indigent. Considering that her mother was being represented by Mr. Vigliano and they were united in interest, there was no basis for the granting of such a motion. However, it is some indication of her financial status.

**15.** He was substituted out of the action by Doris L. Sassower who sought to represent herself in the spring of 1989. He was relieved by court order in March 1989 from representing Elena Sassower when he learned that, without his knowledge, they had made deals with then co-

plaintiff McFadden and one of the defendants concerning an escrow fund.

Grishman states that he was only partially compensated for his services to the Sassowers, and decided to forego any further claims against the Sassowers. He also states that he had indicated to defense counsel early in the proceedings that he was thinking of withdrawing, but at least one of the defense counsel stated that he would object to the application because he was the only reasonable voice speaking for the plaintiffs.

**16.** In this regard, we note that the supervising Magistrate Judge had no criticism of his actions while in the case and that Grishman promptly notified the Magistrate Judge of what he believed to be improper dealings between the plaintiffs and one defendant.

in Yonkers.[17] During the litigation, Vigliano had revealed that he appeared in this action because of his personal relationship with Doris Sassower and not as a paid attorney. We note, however, that in papers submitted in this application, Vigliano had renewed his claim to recover counsel fees. In any case, his paid or unpaid status is not dispositive of his potential responsibility for Rule 11 or § 1927 sanctions.[18] Vigliano points out that during the year he acted as Doris Sassower's attorney, he retained David B. Cohen to do most of the work for him, and that, at trial, Jeremy D. Morley acted as counsel for both plaintiffs, although Vigliano was present at the trial and participated to a limited extent. Consequently, he notes that very few of the documents that were filed were over his signature and that only one of the objectionable ones concerned an attempted interlocutory appeal. (*See* fn. 9 and accompanying text, *supra*.) On the basis of documents, trial work and the complaint, we do not find him responsible for Rule 11 sanctions. However, Vigliano conducted some of the discovery depositions of the defendants. Two of them were particularly shocking and abusive. During the deposition of Director Daisy Hobby, a black woman, he asked her many totally irrelevant racial questions pertaining to persons uninvolved in the case, for the obvious purpose of stirring her up against her codefendants and in favor of the plaintiffs.[19] The questions he asked were reprehensible and clearly in violation of § 1927. He proceeded in the same fashion during the deposition of Curt Haedke. We find that these actions violated § 1927 and require sanctions.

**Co–Plaintiff McFadden and his Counsel**

John McFadden was in a peculiar position throughout the events leading up to and during this litigation for several reasons. At the time of the application by the Sassowers to buy the apartment, although he no longer resided at 16 Lake Street, McFadden was still the President of the Co-op Board. As the president, he had easy access to, and the complete cooperation of, the Board's attorney, Roger Esposito, and the management company, DeSisto Management, Inc., which contracted with the Board to handle certain business aspects. With their assistance, he was able to informally cut certain corners with respect to the Sassowers' occupancy under a sub-lease. Indeed, purportedly with Board permission, Esposito was representing McFadden on the transfer and sale.

When it became clear that the board was not going to accept the Sassower application, McFadden was in a difficult position. Neither he nor, for that matter, the Board could get George and Elena Sassower to vacate the apartment. (To date, they continue to occupy the apartment while a landlord-tenant proceeding drags on in White Plains City Court.) Additionally, McFadden had only a limited time under the Internal Revenue Code to sell the apartment or suffer adverse tax consequences. Consequently, his personal interests supported the sale to the Sassowers. Moreover, the Sassowers made it clear that if he did not join them as a party voluntarily, he would be joined involuntarily as a defendant.[20]

---

**17.** He claims to be a Professor of Law at Pace University School of Law. However, he has not been listed in the Pace catalogs for the last four years as either a full-time professor or an adjunct professor. Inquiry at the Law School reveals that he did teach a single course some five years ago.

**18.** He also points out that he was relieved as attorney for Doris Sassower following the trial of the action but we do not see the pertinency of that fact.

**19.** Some of the irrelevant questions asked of Mrs. Hobby were:
(1) Mrs. Hobby, do you remember the second World War?
(2) Did you ever hear of a woman named Marian Anderson?
(3) Now, did you ever hear of Jackie Robinson?
(4) Before Jackie Robinson played in the major league, were there any blacks playing baseball in the United States?
The deposition continued in that tenor, pursuing irrelevant and improper questions.

**20.** His counsel now states "Mr. McFadden was coerced by plaintiffs Elena Ruth Sassower and Doris L. Sassower to join as plaintiff." McFadden Memorandum at 13.

McFadden's cooperation was additionally valuable to the Sassowers because (1) it provided insight into the rather informal and loose manner in which the Board of the cooperative apartment operated and (2) his participation as plaintiff permitted the complaint and the first amended complaint to appropriately contain causes of action based on McFadden's role as a shareholder in 16 Lake Street Owners, Inc., which complained of a lack of formal process and adherence to the co-op's by-laws in the application procedure.[21] McFadden, thus, was placed in a compromised position. He, himself, was a shareholder in the cooperative and any damages which might have to be paid could come in part from him,[22] since, McFadden states, the insurance carrier reserved its rights to disclaim its coverage under the policy. Moreover, he and his attorney found that they were aligned with rather difficult co-plaintiffs. They considered in 1989 getting out of the case and in May 1990, McFadden finally moved to be allowed to withdraw from the action. The Sassowers objected to this, arguing primarily that they needed his evidentiary assistance in the case. When he agreed to cooperate in that regard, their objections were withdrawn and his motion was granted.

McFadden was a participant in the proceedings for over a year after 42 U.S.C. § 3613(c) made attorneys' fees available to the prevailing party. However, he points out that when the defendants became prevailing parties, he was no longer an opposing party. Moreover, he argues that he withdrew as soon as it became apparent that it was unreasonable to continue litigation. See Oliveri v. Thompson, 803 F.2d at 1277 (awareness of evidence showing claim was not colorable requires discontinuance of action). He claims that, as early as October 1988, before the amendment became effective, he told his counsel that he wished to withdraw and was told that this would only be feasible after his deposition had been concluded. This did not occur until September 1989. Under these circumstances, we agree that he cannot be held responsible for attorneys' fees under the Fair Housing Act.

There is no claim that either McFadden or his attorney were responsible for causing the case to proceed unreasonably or vexatiously. Unlike the Sassowers, he did not make motions for reargument, for amendment, for delays in discovery, or to compel additional discovery, nor did he move to sanction anyone. McFadden is, however, charged with improperly attempting to settle the matter directly with the defendant board by going around defense counsel. In light of the fact that he was a shareholder in the defendant corporation, as well as a former neighbor and close associate of the board members, his impropriety in that regard can be overlooked.

When we come to Rule 11, however, a much closer question emerges. McFadden points out that neither he nor his attorney signed the complaint and that very few of the other documents in the case were signed by them. While this is true, McFadden and his counsel did join in the suit. Their primary wrongdoing was in suing McFadden's own previous attorney and the management agent, both of whom had worked on his behalf when he was trying to get the sale of the apartment to the Sassowers approved by the Board. In his

---

21. The Sassower plaintiffs took a curious approach to these causes of action. They believed that even after McFadden withdrew as plaintiff that as applicants to be stockholders they had a right to pursue these causes of action. Moreover, they seemed to believe that procedural infirmities in the manner in which the application was rejected would result not merely in a direction that they be properly performed, but in the awarding of the apartment and shares in the cooperative to them, along with substantial damages.

22. The plaintiffs object to the cooperative's insurance carrier providing the costs of representation in this action, arguing that it is contrary to public policy to have insurance against being sued for the commission of discriminatory acts. We believe they are wrong in that regard to the extent that you can be insured against the unjustifiable assertion of such claims. Had the plaintiffs prevailed, the question of whether the insurance company could properly indemnify the Board for any damages payable as a result of housing discrimination would be an entirely different matter.

affidavit in opposition, at ¶ 31, McFadden states:

> I have spoken with Roger Esposito many times both before and after this action was commenced. He was the attorney representing me in the sale of Apt. 2C to co-plaintiffs Elena Ruth Sassower and Doris L. Sassower and was the attorney for 16 Lake Street Owners, Inc. I have always told him that I regret his having been dragged into this action. Nor have I ever understood the reason why he was named a party to this action.
>
> \* \* \* \* \* \*
>
> I also spoke with Anthony DeSisto both before and after this action was commenced. I also told him I regretted having been dragged into the action. I also was not sure why his company was a party.

His attorney, James W. Glatthaar, takes much the same position. In his affidavit at ¶¶ 23, 24 and 25, he states:

> I respectfully submit that I, at all times, opposed the naming of DeSisto and Esposito as parties to this action. I felt this way for several reasons. First, Esposito was the attorney who represented John McFadden in the proposed sale of Apt. 2C. I could find nothing in his representation that was improper. Second, neither Mr. DeSisto nor Mr. Esposito had decision-making powers in connection with this application. Third, Mr. Esposito's former law firm is counsel to Broadpark Lodge Corp., a cooperative corporation of which I am a shareholder and past president. As a president I dealt with Mr. Esposito from time to time. Fourth, I saw no basis for claims against either DeSisto or Mr. Esposito, Finally, I spoke with both Mr. DeSisto and Mr. Esposito before the action was commenced. Both indicated their testimony would be helpful.
>
> 24. Notwithstanding the above, the action was commenced within one (1) week after I first met with Doris L. Sassower. She insisted upon commencing the action instantly before her mort-

gage commitment expired. She was insistent that DeSisto and Mr. Esposito be named as a party for their role in this matter.

> 25. After the action was commenced Mr. McFadden and I discussed the possibility of stipulating to discontinue. We also discussed the possibility of allowing DeSisto and Mr. Esposito to be dropped as parties. However, plaintiffs adamantly opposed such a stipulation.

Their own words attest to the fact that at the time the complaint was filed, both McFadden and his counsel were aware that suit against Esposito and DeSisto was improper. Nevertheless, they allowed the suit in McFadden's name to go forward.

The question, therefore, is whether a knowledgeable plaintiff and an experienced attorney can excuse their actions in suing clearly innocent parties merely to pacify an insistent Doris Sassower. We think not. Either under Rule 11 or the equitable powers of the court, they should be compelled to reimburse Esposito and DeSisto for a portion of their attorneys' fees.[23]

### ATTORNEYS' FEES AND SANCTIONS PAYABLE TO DEFENDANTS

The next matter to be addressed is the actual fees and sanctions. We emphasize that all fees and sanctions are to be paid directly to the defendants.

#### A. *Attorneys' Fees Payable by Plaintiffs Under the Fair Housing Act*

The attorney for 16 Lake Street Owners, Inc. and the various individual board members, Lawrence J. Glynn, seeks $142,625 in attorneys' fees, as well as costs and expenses in the amount of $850. This is based on 570.5 hours of work billed at $250 an hour. We have already decided that he should not, under the Fair Housing Act, be reimbursed for the time spent prior to March 10, 1989, when the amendment providing for attorneys' fees to a prevailing party took effect. The record indicates that 3/16ths of the time charged was expend-

---

**23.** Obviously, they were going to be sued by the Sassowers even without McFadden's participation, but his participation exacerbated the problem.

ed during that period. We have also noted that Glynn was accepting $100 an hour from the insurance carrier which leads us to the conclusion that the claimed hourly charge of $250 an hour is excessive.

Plaintiffs raise many objections to the time charges, claiming that they are not contemporaneous and are patently deficient and fraudulent. For example, they note that the time sheets of Diamond, Rutman record the same number of hours for the conducting of depositions as does Glynn, attorney for the board and this is indicative of copying. Logic dictates that if both attorneys were present for the deposition, they should have been present for the same number of hours. Conversely, they note that other attorneys bill time for meetings with Glynn that do not appear in Glynn's records. Why they should complain about this as it pertains to Glynn, we cannot imagine. While there may be deficiencies in Glynn's recordkeeping, they are not substantial. However, some of the time billed by Glynn and submitted here concerned the City Court proceedings seeking unsuccessfully to evict the Sassowers and should not be included as part of this case. Under the circumstances, we award him $50,000 in fees, plus $850 for expenses.

The attorney for Hale Apartments, Dennis T. Bernstein, seeks fees for a total of 218 hours at $100 an hour, plus $772 in disbursements. (Some additional time is charged after the granting of summary judgment on behalf of his client.) Of this, however, almost half of the time was spent before the amendment to the Act. His time sheets, plaintiffs' complaints notwithstanding, are quite accurate and informative. His client is awarded $12,000 in fees and $500 in disbursements.

The firm of Diamond, Rutman & Costello, representing defendant Roger Esposito, seeks $39,345.24 based on 466.75 hours, including a little over $2,000 in litigation expenses. Its billing rate is $80 per hour, the lowest of any of the defense lawyers. As with the other attorneys, some of their time was expended prior to the Act being amended and may not, therefore, be award-

ed to the defendants. We also believe the hours expended are excessive, even allowing for the difficulty of dealing with plaintiffs and their attorneys. In addition, we note that Diamond, Rutman was sanctioned by the Magistrate Judge because of improprieties during discovery and ordered to pay $8,000 to the Sassowers. Under the circumstances, Esposito is awarded only $18,000 for fees and expenses as a prevailing party.

Marshall, Conway & Wright, as attorneys for DeSisto Management, seek $21,-556 in fees and disbursements. Their time sheets are extremely inadequate in that they do not set forth the amount of time involved or the hourly rate being charged for each service. Indeed, these items are never totalled up. (Hourly expenditures appear only starting on June 27, 1990.) Consequently, DeSisto Management is awarded only $12,000 in attorneys' fees and expenses.

## B. *Sanctions for Unnecessarily Prolonging the Action Pursuant to 28 U.S.C. § 1927*

The effect of prolonging the action was simply to increase the attorneys' fees of the defendants which have been reimbursed above. Consequently, as it pertains to the plaintiffs who are liable for those fees, there is no need to add them on top. However, on the possibility that the awarding of attorneys' fees to the prevailing party pursuant to the Fair Housing Act is not upheld on appeal, we will set forth the amount of § 1927 sanctions which would alternatively be payable by the plaintiffs to the defendants:

To the clients of:
1. Lawrence J. Glynn: $20,000
2. Dennis T. Bernstein: $7,000
3. Diamond, Rutman & Costello: $7,500
4. Marshall, Conway & Wright: $7,500

Eli Vigliano, as noted above, is not responsible for attorneys' fees under the Fair Housing Act or Rule 11 sanctions. However, in light of his behavior at depositions, he is directed to pay $1,000 to Daisy Hobby and $500 to Curt Haedke.

## C. *Rule 11 Sanctions*

These sanctions are not directly connected with the fees expended by the defense attorneys nor can they be prorated in that fashion. We find that the appropriate sanction against the plaintiffs for commencing and prosecuting this meritless litigation is the sum of $50,000. However, we note that the total attorneys' fees to be paid under the above disposition far exceeds that amount. Consequently, as to the plaintiffs who must pay those fees we do not believe that Rule 11 sanctions need be administered as an additional sanction. In the event that it should ultimately be held that they are not required to pay attorneys' fees under the Fair Housing Act, these sanctions will stand with one-half to be paid to the clients of Lawrence J. Glynn and the remainder to be distributed equally among the clients of the other firms.

As noted earlier, John McFadden and his counsel are in violation of Rule 11 independently with respect to their suing DeSisto Management and Roger Esposito. We assess Rule 11 sanctions against that plaintiff and his counsel, jointly and severally, in the amount of $3,000 to be paid to DeSisto Management and $3,000 to be paid to Roger Esposito.

### THE PLAINTIFFS' MOTION FOR SANCTIONS, ATTORNEYS' FEES AND A NEW TRIAL

Plaintiffs move for sanctions, attorneys' fees and a new trial under Rule 60(b)(3) of the Federal Rules of Civil Procedure. This motion was made months after trial and weeks after receiving the defendants' motion for sanctions and attorneys' fees, while plaintiffs were complaining that they had inadequate time to respond to their opponent's motion. Rule 60(b)(3) permits a motion for relief from judgment or order based upon fraud, misrepresentation or misconduct of an adverse party.

The plaintiffs' papers in support of this motion are several hundred pages in length supported by about a thousand pages in exhibits. We cannot find any rationale for such voluminous papers except a possible belief by the plaintiffs that the court could not possibly find time to read through all of them, which would necessitate a delay in ruling on the defendants' earlier motion because the plaintiffs' papers contain opposition to that motion, as well.[24]

Plaintiffs' motion attempts to reargue for the third time all of the previous discovery and substantive rulings adverse to plaintiffs, as well as their request for a new trial which had already been made and denied by decision on May 16, 1991. One has to wonder what was the true motive for such a bizarre motion. The plaintiffs claim they have documentary evidence demonstrating the fraud, perjury and chicanery of opposing counsel which constitutes fraud under Rule 60(b)(3). They do cite to many documents but these documents are mostly their own earlier affidavits and memorandum of law. (The plaintiffs' arguments do not improve by repetition.) Their view of any factual disputes has been, all along, that their claims are to be acknowledged without dispute and the contrary evidence of the defendants is to be rejected as fraud and perjury. When matters reach this state, there is no alternative except to have the credibility of the parties tested at a trial. We had such a trial and the Sassowers' case was found by the jury to be wanting. We have reviewed the evidence and have already held that the jury verdict was not contrary to the weight of the evidence.

The plaintiffs attempt to prove misconduct by the opposing attorneys by citing to a footnote in this court's memorandum decision, dated October 11, 1990, in which we stated:

> The behavior of the attorneys and the parties to this action are unprecedented and, when the case is concluded, some action should be taken with respect thereto.

What plaintiffs fail to observe is that the footnote is appended to a description of

**24.** One of the more interesting parts of plaintiffs' papers is on page 17 of Affirmation C. Although the page number is neatly typed at the bottom, the page is otherwise blank.

plaintiffs' own earlier obstructive tactics. Additionally, plaintiffs' claim that they have been deprived of property of a substantial value because of the failure of the defendants to sign the original of their deposition transcripts and return them to the plaintiffs. This has no relevance under Rule 60(b)(3). In any case, the rules quite clearly state the manner in which such a failing can be overcome. A signed original deposition transcript is not essential to the trial of an action. Moreover, we find the argument somewhat specious in light of a letter sent to us by the court reporter who produced these transcripts, complaining that the Sassowers have not paid her.

Plaintiffs demand disciplinary sanctions to uphold the dignity of the court against all of the various defense attorneys involved in this case pursuant to Rule 4(f) of the General Rules of the United States District Courts for the Southern and Eastern Districts of New York. We do not see that rule as providing any rights to the plaintiffs whatsoever. If any attorney were to be subjected to that rule, it would be Doris Sassower, but since she has been suspended from the practice of law in this state that might be an act of supererogation.

As a final matter, we note that on June 17, 1991, the plaintiffs filed a notice of appeal from the judgment in this case and the decision denying plaintiffs' motion for recusal and a new trial, as well as the denial of reargument thereof. To date, the plaintiffs have not ordered the transcript of the trial. We perceive the possibility that plaintiffs may be intending to appeal on the basis of the papers contained in their lengthy motions which would result in the Court of Appeals not having the papers opposing the motions nor having the trial transcript. Should that be the plaintiffs' intent, it can be dealt with appropriately at a subsequent time.

CONCLUSION

Attorneys' fees and sanctions are awarded to the defendants to be paid by the named plaintiffs and attorneys as described above. Plaintiffs' motion is in all respects denied.

SO ORDERED.