## TULL *v.* UNITED STATES

No. 85–1259.   Argued January 21, 1987—Decided April 28, 1987

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined, and in Parts I and II of which STEVENS and SCALIA, JJ., joined. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 427.

*Richard R. Nageotte* argued the cause for petitioner. With him on the briefs was *E. Barrett Prettyman, Jr.*

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Habicht, Charles A. Rothfeld, Anne S. Almy,* and *Claire L. McGuire.**

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Herbert L. Fenster, Stanley W. Landfair,* and *Robin S. Conrad;* for the Virginia Trial Lawyers Association et al. by *Mary Lynn Tate;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar.*

*Robert H. Whaley* and *Bryan P. Harnetiaux* filed a brief for the Washington State Trial Lawyers Association as *amicus curiae.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether the Seventh Amendment guaranteed petitioner a right to a jury trial on both liability and amount of penalty in an action instituted by the Federal Government seeking civil penalties and injunctive relief under the Clean Water Act, 62 Stat. 1155, as amended, 33 U. S. C. § 1251 *et seq.*

## I

The Clean Water Act prohibits discharging, without a permit, dredged or fill material into "navigable waters," including the wetlands adjacent to the waters. 33 U. S. C. §§ 1311, 1344, and 1362(7); 33 CFR §§ 323.2(a)(1)–(7) (1986). "Wetlands" are "swamps, marshes, bogs and similar areas." 33 CFR § 323.2(c) (1986). The Government sued petitioner, a real estate developer, for dumping fill on wetlands on the island of Chincoteague, Virginia. The Government alleged in the original complaint that petitioner dumped fill on three sites: Ocean Breeze Mobile Homes Sites, Mire Pond Properties, and Eel Creek. The Government later amended the complaint to allege that petitioner also placed fill in a manmade waterway, named Fowling Gut Extended, on the Ocean Breeze property.[1]

Section 1319 enumerates the remedies available under the Clean Water Act. Subsection (b) authorizes relief in the form of temporary or permanent injunctions. Subsection (d) provides that violators of certain sections of the Act "shall be subject to a civil penalty not to exceed $10,000 per day" during the period of the violation. The Government sought in

---

[1] Additionally, the Government alleged that petitioner's dumping of fill in Fowling Gut Extended violated another statute, the Rivers and Harbors Act, which prohibits the placement of fill in navigable waters without the authorization of the Secretary of the Army. 33 U. S. C. § 403. Petitioner does not base his Seventh Amendment claim on the Government's prosecution under this statute, which provides for injunctive relief but not for civil penalties.

this case both injunctive relief and civil penalties. When the complaint was filed, however, almost all of the property at issue had been sold by petitioner to third parties. Injunctive relief was therefore impractical except with regard to a small portion of the land.[2] App. 110, 119. The Government's complaint demanded the imposition of the maximum civil penalty of $22,890,000 under subsection (d). App. 31–34.

Petitioner's timely demand for a trial by jury was denied by the District Court. During the 15-day bench trial, petitioner did not dispute that he had placed fill at the locations alleged and did not deny his failure to obtain a permit. Petitioner contended, however, that the property in question did not constitute "wetlands." 615 F. Supp. 610, 615–618 (ED Va. 1983). The Government concedes that triable issues of fact were presented by disputes between experts involving the composition and nature of the fillings. Tr. of Oral Arg. 44.

The District Court concluded that petitioner had illegally filled in wetland areas on all properties in question, but drastically reduced the amount of civil penalties sought by the Government. With respect to the Ocean Breeze Mobile Homes Sites, the court imposed a civil fine of $35,000, noting that petitioner had sold seven lots at a profit of $5,000 per lot. 615 F. Supp., at 626. The court fined petitioner another $35,000 for illegal fillings on the Mire Pond Properties, *ibid.*, and $5,000 for filling that affected a single lot in Eel Creek, *ibid.*, although petitioner had realized no profit from filling in these properties. In addition, the court imposed on petitioner a $250,000 fine to be suspended, however, "on the specific condition that he restore the extension of Fowling Gut to its former navigable condition . . . ." *Id.*, at 627. Although petitioner argued that such restoration required purchasing

---

[2] The Government's complaint alleged violations involving over 1 million square feet of land. The Government obtained injunctive relief, however, relating to only 6,000 square feet. Brief for Petitioner 5.

the land from third parties at a cost of over $700,000, thus leaving him no choice but to pay the fine, the court refused to alter this order. App. 107a–108a. The court also granted separate injunctive relief: it ordered the restoration of wetlands on the portions of Mire Pond and Eel Creek still owned by petitioner, 615 F. Supp., at 627, and further ordered the removal of fillings on five lots of the Ocean Breeze Mobile Home Sites unless petitioner were granted an "after-the-fact permit" validating the fillings. *Id.*, at 626.

The Court of Appeals affirmed over a dissent, rejecting petitioner's argument that, under the Seventh Amendment, he was entitled to a jury trial. 769 F. 2d 182 (CA4 1985). The court expressly declined to follow the decision of the Court of Appeals for the Second Circuit in *United States* v. *J. B. Williams Co.*, 498 F. 2d 414 (1974), which held that there was a Seventh Amendment "'right of jury trial when the United States sues . . . to collect a [statutory civil] penalty, even though the statute is silent on the right of jury trial.'" 498 F. 2d, at 422–423 (quoting 5 J. Moore, Federal Practice ¶38.–31[1], pp. 232–233 (2d ed. 1971)). The Court of Appeals in this case also found unpersuasive the dictum in *Hepner* v. *United States*, 213 U. S. 103, 115 (1909), and in *United States* v. *Regan*, 232 U. S. 37, 46–47 (1914), that the Seventh Amendment's guarantee applies to civil actions to collect a civil penalty. The court concluded that, while in *Hepner* and *Regan* the civil penalties were statutorily prescribed fixed amounts, the District Court in the present case exercised "statutorily conferred equitable power in determining the amount of the fine." 769 F. 2d, at 187. The Court of Appeals also noted that the District Court fashioned a "'package' of remedies" containing both equitable and legal relief with "one part of the package affecting assessment of the others." *Ibid.*

In *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 449, n. 6 (1977), we explicitly declined to decide whether the dictum of *Hepner* and

*Regan* "correctly divines the intent of the Seventh Amendment." To resolve this question and the conflict between Circuits, we granted certiorari. 476 U. S. 1139 (1986). We reverse.

## II

The Seventh Amendment provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."[3] The Court has construed this language to require a jury trial on the merits in those actions that are analogous to "Suits at common law." Prior to the Amendment's adoption, a jury trial was customary in suits brought in the English *law* courts. In contrast, those actions that are analogous to 18th-century cases tried in courts of equity or admiralty do not require a jury trial. See *Parsons* v. *Bedford,* 3 Pet. 433 (1830). This analysis applies not only to common-law forms of action, but also to causes of action created by congressional enactment. See *Curtis* v. *Loether,* 415 U. S. 189, 193 (1974).

To determine whether a statutory action is more similar to cases that were tried in courts of law than to suits tried in courts of equity or admiralty, the Court must examine both the nature of the action and of the remedy sought. First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. See, *e. g., Pernell* v. *Southall Realty,* 416 U. S. 363, 378 (1974); *Dairy Queen, Inc.* v. *Wood,* 369 U. S. 469, 477 (1962). Second, we examine the remedy sought and

---

[3] Before initiating the inquiry into the applicability of the Seventh Amendment, "[w]e recognize, of course, the 'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'" *Curtis* v. *Loether,* 415 U. S. 189, 192, n. 6 (1974) (citation omitted); see also *Pernell* v. *Southall Realty,* 416 U. S. 363, 365 (1974). Nothing in the language of the Clean Water Act or its legislative history implies any congressional intent to grant defendants the right to a jury trial during the liability or penalty phase of the civil suit proceedings. Given this statutory silence, we must answer the constitutional question presented.

determine whether it is legal or equitable in nature. See,
*e. g., Curtis* v. *Loether, supra,* at 196; *Ross* v. *Bernhard,* 396
U. S. 531, 542 (1970).[4]

### A

Petitioner analogizes this Government suit under § 1319(d)
to an action in debt within the jurisdiction of English courts
of law. Prior to the enactment of the Seventh Amendment,
English courts had held that a civil penalty suit was a particu-
lar species of an action in debt that was within the jurisdic-
tion of the courts of law. See, *e. g., Atcheson* v. *Everitt,* 1
Cowper 382, 98 Eng. Rep. 1142 (K. B. 1776) (characterizing
civil penalty suit as a type of action in debt); *Calcraft* v.
*Gibbs,* 5 T. R. 19, 101 Eng. Rep. 11 (K. B. 1792) (granting
new jury trial in an action in debt for a civil penalty).

After the adoption of the Seventh Amendment, federal
courts followed this English common law in treating the civil
penalty suit as a particular type of an action in debt, requir-
ing a jury trial. See, *e. g., United States* v. *Mundell,* 27 F.
Cas. 23 (No. 15,834) (CC Va. 1795) (bail not required in a civil
penalty case tried by a jury because it was an action in debt);
*Jacob* v. *United States,* 13 F. Cas. 267 (No. 7,157) (CC Va.
1821) (action in debt by United States to recover civil penalty
of $500 and costs of violation of an Act of Congress); *Lees* v.
*United States,* 150 U. S. 476, 479 (1893) ("[A]lthough the re-
covery of a penalty is a proceeding criminal in nature, yet in
this class of cases it may be enforced in a civil action, and in
the same manner that debts are recovered in the ordinary
civil courts"). Actions by the Government to recover civil

---

[4]The Court has also considered the practical limitations of a jury trial
and its functional compatibility with proceedings outside of traditional
courts of law in holding that the Seventh Amendment is not applicable to
administrative proceedings. See, *e. g., Atlas Roofing Co.* v. *Occupa-
tional Safety and Health Review Comm'n,* 430 U. S. 442, 454 (1977);
*Pernell* v. *Southall Realty, supra,* at 383. But the Court has not used
these considerations as an independent basis for extending the right to a
jury trial under the Seventh Amendment.

penalties under statutory provisions therefore historically have been viewed as one type of action in debt requiring trial by jury.

It was against this historical background that the Court in *Hepner* v. *United States*, 213 U. S. 103 (1909), considered the propriety of a directed verdict by a District Court Judge in favor of the Government where there was undisputed evidence that a defendant had committed an offense under § 8 of the Alien Immigration Act of 1903, which provided for a $1,000 civil penalty. The Court held that a directed verdict was permissible and did not violate the defendant's right to a jury trial under the Seventh Amendment. The Court said:

> "The objection made in behalf of the defendant, that an affirmative answer to the question certified could be used so as to destroy the constitutional right of trial by jury, is without merit and need not be discussed. *The defendant was, of course, entitled to have a jury summoned in this case*, but that right was subject to the condition, fundamental in the conduct of civil actions, that the court may withdraw a case from the jury and direct a verdict, according to the law if the evidence is uncontradicted and raises only a question of law." 213 U. S., at 115 (emphasis added).

In *United States* v. *Regan*, 232 U. S. 37 (1914), the Court assumed that a jury trial was required in civil penalty actions. In that case, the Court upheld the validity of a jury instruction in an action brought by the Government under the Alien Immigration Act of 1907. The Court stated that the instruction requiring proof beyond a reasonable doubt was incorrect because:

> "While the defendant was entitled to have the issues tried before a jury, this right did not arise from Article III of the Constitution or from the Sixth Amendment, for both relate to prosecutions which are strictly criminal in their nature, but it derives out of the fact that in a civil

action of debt involving more than twenty dollars a jury trial is demandable." 232 U. S., at 47 (citation omitted).

In the instant case, the Government sought penalties of over $22 million for violation of the Clean Water Act and obtained a judgment in the sum of $325,000. This action is clearly analogous to the 18th-century action in debt, and federal courts have rightly assumed that the Seventh Amendment required a jury trial.

The Government argues, however, that—rather than an action in debt—the closer historical analog is an action to abate a public nuisance. In 18th-century English law, a public nuisance was "an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects.'" W. Prosser, Law of Torts 583 (4th ed. 1971) (hereinafter Prosser) (footnote omitted). The Government argues that the present suit is analogous to two species of public nuisances. One is the suit of the sovereign in the English courts of equity for a "purpresture" to enjoin or order the repair of an enclosure or obstruction of public waterways; the other is the suit of the sovereign to enjoin "offensive trades and manufactures" that polluted the environment. 4 W. Blackstone, Commentaries * 167.

It is true that the subject matter of this Clean Water Act suit—the placement of fill into navigable waters—resembles these two species of public nuisance. Whether, as the Government argues, a public nuisance action is a better analogy than an action in debt is debatable. But we need not decide the question. As *Pernell* v. *Southall Realty*, 416 U. S., at 375, cautioned, the fact that the subject matter of a modern statutory action and an 18th-century English action are close equivalents "is irrelevant for Seventh Amendment purposes," because "that Amendment requires trial by jury in actions unheard of at common law." It suffices that we conclude that both the public nuisance action and the action in debt are appropriate analogies to the instant statutory action.

The essential function of an action to abate a public nuisance was to provide a civil means to redress "a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort or convenience of the general public." Prosser 583.[5] Similarly, the essential function of an action in debt was to recover money owed under a variety of statutes or under the common law. Both of these 18th-century actions, then, could be asserted by the sovereign to seek relief for an injury to the public in numerous contexts.

We need not rest our conclusion on what has been called an "abstruse historical" search for the nearest 18th-century analog. See *Ross* v. *Bernhard*, 396 U. S., at 538, n. 10. We reiterate our previously expressed view that characterizing the relief sought is "[m]ore important" than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial. *Curtis* v. *Loether*, 415 U. S., at 196.[6]

---

[5] Public nuisances included "interferences with the public health, as in the case of a hogpen, the keeping of diseased animals, or a malarial pond; with the public safety, as in the case of the storage of explosives, the shooting of fireworks in the streets, harboring a vicious dog, or the practice of medicine by one not qualified; with public morals, as in the case of houses of prostitution, illegal liquor establishments, gambling houses, indecent exhibitions, bullfights, unlicensed prize fights, or public profanity; with the publice [sic] peace, as by loud and disturbing noises, or an opera performance which threatens to cause a riot; with the public comfort, as in the case of bad odors, smoke, dust and vibration; with public convenience, as by obstructing a highway or a navigable stream, or creating a condition which makes travel unsafe or highly disagreeable, or the collection of an inconvenient crowd; and in addition, such unclassified offenses as eavesdropping on a jury, or being a common scold." Prosser 583–585 (footnotes omitted).

[6] The Government contends that both the cause of action and the remedy must be legal in nature before the Seventh Amendment right to a jury trial attaches. It divides the Clean Water Act action for civil penalties into a cause of action and a remedy, and analyzes each component as if the other were irrelevant. Thus, the Government proposes that a public nuisance action is the better historical analog for the cause of action, and that

## B

A civil penalty was a type of remedy at common law that could only be enforced in courts of law. Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity. See, *e. g.*, *Curtis* v. *Loether, supra,* at 197 (punitive damages remedy is legal, not equitable, relief); *Ross* v. *Bernhard, supra,* at 536 (treble-damages remedy for securities violation is a penalty, which constitutes legal relief).[7] The action authorized by § 1319(d) is of this character. Subsection (d) does not direct that the "civil penalty" imposed be calculated solely on the basis of equitable determinations, such as the profits gained from violations of the statute, but simply imposes a maximum penalty of $10,000 per day of violation. The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. 123 Cong. Rec. 39191 (1977) (remarks of Sen. Muskie citing Environmental Protection Agency (EPA) memorandum outlining enforcement policy).[8] A court can

---

an action for disgorgement is the proper analogy for the remedy. We reject this novel approach. Our search is for a single historical analog, taking into consideration the nature of the cause of action and the remedy as two important factors. See *Pernell* v. *Southall Realty,* 416 U. S., at 375; *Curtis* v. *Loether,* 415 U. S., at 195–196.

[7] The Government distinguishes this suit from other actions to collect a statutory penalty on the basis that the statutory penalty here is not fixed or readily calculable from a fixed formula. We do not find this distinction to be significant. The more important characteristic of the remedy of civil penalties is that it exacts punishment—a kind of remedy available only in courts of law. Thus, the remedy of civil penalties is similar to the remedy of punitive damages, another legal remedy that is not a fixed fine. See, *e. g.*, *Curtis* v. *Loether, supra,* at 189–190 (defendant entitled to jury trial in an action based on a statute authorizing actual damages and punitive damages of not more than $1,000).

[8] When Congress enacted the 1977 amendments to the Clean Water Act, it endorsed the EPA's then-existing penalty calculation policy. 123 Cong.

require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements. *Ibid.* It may also seek to deter future violations by basing the penalty on its economic impact. *Ibid.* Subsection 1319(d)'s authorization of punishment to further retribution and deterrence clearly evidences that this subsection reflects more than a concern to provide equitable relief. In the present case, for instance, the District Court acknowledged that petitioner received no profits from filling in properties in Mire Pond and Eel Creek, but still imposed a $35,000 fine. App. to Pet. for Cert. 60a. Thus, the District Court intended not simply to disgorge profits but also to impose punishment. Because the nature of the relief authorized by § 1319(d) was traditionally available only in a court of law, petitioner in this present action is entitled to a jury trial on demand.

The punitive nature of the relief sought in this present case is made apparent by a comparison with the relief sought in an action to abate a public nuisance. A public nuisance action was a classic example of the kind of suit that relied on the injunctive relief provided by courts in equity. Prosser 603. "Injunctive relief [for enjoining a public nuisance at the request of the Government] is traditionally given by equity upon a showing of [peril to health and safety]." *Steelworkers* v. *United States*, 361 U. S. 39, 61 (1959) (Frankfurter, J., concurring). The Government, in fact, concedes that public

Rec. 39190–39191 (1977) (remarks of Sen. Muskie). This policy was developed to guide EPA negotiators in reaching settlements with violators of the Act. The policy instructed negotiators to consider a number of factors: the seriousness of the violations, the economic benefits accrued from the violations, prior violations, good-faith efforts to comply with the relevant requirements, and the economic impact of the penalty. After the Court heard argument in this case, § 1319(d) was amended to require the trial court to consider these factors in determining the amount of a civil penalty along with "such other matters as justice may require." § 313(d), Water Quality Act of 1987, Pub. L. 100–4, 101 Stat. 47.

nuisance cases brought in equity sought injunctive relief, not monetary penalties. Brief for United States 24, n. 17. Indeed, courts in equity refused to enforce such penalties. See James, Right to a Jury Trial in Civil Actions, 72 Yale L. J. 655, 672 (1963).

The Government contends, however, that a suit enforcing civil penalties under the Clean Water Act is similar to an action for disgorgement of improper profits, traditionally considered an equitable remedy. It bases this characterization upon evidence that the District Court determined the amount of the penalties by multiplying the number of lots sold by petitioner by the profit earned per lot. Tr. of Oral Arg. 27. An action for disgorgement of improper profits is, however, a poor analogy. Such an action is a remedy only for restitution—a more limited form of penalty than a civil fine. Restitution is limited to "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant." *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 402 (1946). As the above discussion indicates, however, § 1319(d)'s concerns are by no means limited to restoration of the status quo.

The Government next contends that, even if the civil penalties under § 1319(d) are deemed legal in character, a jury trial is not required. A court in equity was empowered to provide monetary awards that were incidental to or intertwined with injunctive relief. The Government therefore argues that its claim under § 1319(b), which authorizes injunctive relief, provides jurisdiction for monetary relief in equity. Brief for United States 38. This argument has at least three flaws. First, while a court in equity may award monetary restitution as an adjunct to injunctive relief, it may not enforce civil penalties. See *Porter* v. *Warner Holding Co.*, *supra*, at 399. Second, the Government was aware when it filed suit that relief would be limited primarily to civil penalties, since petitioner had already sold most of the properties at issue. App. 110, 119. A potential penalty of $22 million

hardly can be considered incidental to the modest equitable relief sought in this case.

Finally, the Government was free to seek an equitable remedy in addition to, or independent of, legal relief. Section 1319 does not intertwine equitable relief with the imposition of civil penalties. Instead each kind of relief is separably authorized in a separate and distinct statutory provision. Subsection (b), providing injunctive relief, is independent of subsection (d), which provides only for civil penalties. In such a situation, if a "legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." *Curtis* v. *Loether*, 415 U. S., at 196, n. 11. Thus, petitioner has a constitutional right to a jury trial to determine his liability on the legal claims.

## III

The remaining issue is whether petitioner additionally has a Seventh Amendment right to a jury assessment of the civil penalties. At the time this case was tried, § 1319(d) did not explicitly state whether juries or trial judges were to fix the civil penalties. The legislative history of the 1977 Amendments to the Clean Water Act shows, however, that Congress intended that trial judges perform the highly discretionary calculations necessary to award civil penalties after liability is found. 123 Cong. Rec. 39190–39191 (1977) (remarks of Sen. Muskie citing letter from EPA Assistant Administrators of Enforcement of Dec. 14, 1977) ("[P]enalties assessed by judges should be sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle"). We must decide therefore whether Congress can, consistent with the Seventh Amendment, authorize judges to assess civil penalties.

The Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must

determine liability.[9] The answer must depend on whether the jury must shoulder this responsibility as necessary to preserve the "substance of the common-law right of trial by jury." *Colgrove* v. *Battin*, 413 U. S. 149, 157 (1973). Is a jury role necessary for that purpose? We do not think so. "'Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed beyond the reach of the legislature.'" *Id.*, at 156, n. 11 (quoting Scott, Trial by Jury and the Reform of Civil Procedure, 31 Harv. L. Rev. 669, 671 (1918)). See also *Galloway* v. *United States*, 319 U. S. 372, 392 (1943) ("[T]he Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements"). The assessment of a civil penalty is not one of the "most fundamental elements." Congress' authority to fix the penalty by statute has not been questioned, and it was also the British practice, see, *e. g.*, *Atcheson* v. *Everitt*, 1 Cowper 382, 98 Eng. Rep. 1142 (K. B. 1776). In the United States, the action to recover civil penalties usually seeks the amount fixed by Congress. See, *e. g.*, *United States* v. *Regan*, 232 U. S., at 40; *Hepner* v. *United States*, 213 U. S., at 109. The assessment of civil penalties thus cannot be said to involve the "substance of a common-law right to a trial by jury," nor a "fundamental element of a jury trial."

Congress' assignment of the determination of the amount of civil penalties to trial judges therefore does not infringe on

---

[9] Nothing in the Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial. Instead, the language "defines the kind of cases for which jury trial is preserved, namely 'suits at common law.'" *Colgrove* v. *Battin*, 413 U. S. 149, 152 (1973). Although " '[w]e have almost no direct evidence concerning the intention of the framers of the seventh amendment itself,' the historical setting in which the Seventh Amendment was adopted highlighted a controversy that was generated . . . by fear that the civil jury itself would be abolished." *Ibid.* (footnote and citation omitted). We have been presented with no evidence that the Framers meant to extend the right to a jury to the remedy phase of a civil trial.

the constitutional right to a jury trial. Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges. In this case, highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act. These are the kinds of calculations traditionally performed by judges. See *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 442–443 (1975) (REHNQUIST, J., concurring). We therefore hold that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action.

## IV

We conclude that the Seventh Amendment required that petitioner's demand for a jury trial be granted to determine his liability, but that the trial court and not the jury should determine the amount of penalty, if any. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

I join the Court's disposition, and Parts I and II of its opinion. I do not join Part III because in my view the right to trial by jury on whether a civil penalty of unspecified amount is assessable also involves a right to trial by jury on what the amount should be. The fact that the Legislature could elect to fix the amount of penalty has nothing to do with whether, if it chooses not to do so, that element comes within the jury-trial guarantee. Congress could, I suppose, create a private cause of action by one individual against another for a fixed amount of damages, but it surely does not follow that if it creates such a cause of action *without* prescribing the amount of damages, that issue could be taken from the jury.

While purporting to base its determination (quite correctly) upon historical practice, the Court creates a form of civil adjudication I have never encountered. I can recall no precedent for judgment of civil liability by jury but assessment of amount by the court. Even punitive damages are assessed by the jury when liability is determined in that fashion. One is of course tempted to make an exception in a case like this, where the Government is imposing a noncompensatory remedy to enforce direct exercise of its regulatory authority, because there comes immediately to mind the role of the sentencing judge in a criminal proceeding. If criminal trials are to be the model, however, determination of liability by the jury should be on a standard of proof requiring guilt beyond a reasonable doubt. Having chosen to proceed in civil fashion, with the advantages which that mode entails, it seems to me the Government must take the bitter with the sweet. Since, as the Court correctly reasons, the proper analogue to a civil-fine action is the common-law action for debt, the Government need only prove liability by a preponderance of the evidence; but must, as in any action for debt, accept the amount of award determined not by its own officials but by 12 private citizens. If that tends to discourage the Government from proceeding in this fashion, I doubt that the Founding Fathers would be upset.

I would reverse and remand for jury determination of both issues.