**UNITED STATES of America, Plaintiff,**

v.

**SHEYENNE TOOLING
& MANUFACTURING
CO., INC., Defendant.**

**No. A3–95–110.**

United States District Court,
D. North Dakota,
Southeastern Division.

Dec. 30, 1996.

John T. Schneider, U.S. Atty., Fargo, ND, Lois J. Schiffer, Matthew W. Morrison, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

John H. Moosbrugger, Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, ND, for Defendant.

### MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This is an action brought by the United States of America on behalf of the Environmental Protection Agency (EPA) for damages for the failure of Sheyenne Tooling & Manufacturing Co., Inc. (Sheyenne) to comply with the Clean Water Act (Act), 33 U.S.C. §§ 1317, 1318, and 1319. The action is brought by the Administrator of the EPA pursuant to 33 U.S.C. § 1251(d), after the EPA issued an order for compliance pursuant to 33 U.S.C. § 1319(a)(2)(A). Upon Sheyenne's claimed failure to comply with that order, the Administrator brought this civil action for damages pursuant to 33 U.S.C. § 1319(a)(2)(B), (a)(6).

As described by the Supreme Court, "[the Act], 86 Stat. 816, 33 U.S.C. § 1251 et seq. (1982 ed. and Supp. III). was enacted in 1972 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' § 1251(a). In order to achieve these goals, § 301(a) of the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act. 33 U.S.C. § 1311(a)." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 51, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987).

The Act is a strict liability statute; and thus, there need be no showing of maliciousness, willfulness, or fault to support a finding of liability under the Act. *See, e.g., U.S. v. Texas Pipe Line Company,* 611 F.2d 345, 347 (10th Cir.1979); *U.S. v. Winchester Municipal Utilities,* 944 F.2d 301, 304 (6th Cir.1991); *U.S. v. CPS Chemical Company Inc.,* 779 F.Supp. 437, 442 (E.D.Ark.1991). A finding of liability under the Act may be supported simply by the establishment of its violation.

Reports and records that are required to be kept under the Act, serve as admissions towards the establishment of its violation, and thus serve to establish the liability of a polluting defendant. *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1135 (11th Cir. 1990). *See also, Student Public Interest Research Group of New Jersey, Inc., v. Monsanto Co.,* 600 F.Supp. 1479, 1485 (D.N.J. 1985); *CPS Chemical Company,* 779 F.Supp. at 442. This reporting requirement may be fairly characterized then, as Mr. Justice Stevens put it in his dissent in *U.S. v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742, *reh'g denied,* 448 U.S. 916, 101 S.Ct. 37, 65 L.Ed.2d 1179 (1980), as "a form of compelled self-incrimination." *Id.,* 448 U.S. at 259, 100 S.Ct. at 2646.

This action seeks civil penalties against the defendant for its failure to meet its obligations under the Act, specifically its failure to control its discharge of pollutants in violation of effluent limitations contained in national Categorical Pretreatment Standards regulations found at 40 C.F.R. ch. 433, a failure to submit timely and complete reports as required by 40 C.F.R. ch. 403, and a

failure to sample and analyze its regulated waste water prior to discharge into a publicly owned treatment works (POTW) as required by 40 C.F.R. §§ 433.15 and 403.12.

The United States acknowledges that the maximum penalty of approximately $108 million which it calculates could be levied against Sheyenne is not an appropriate sum, and, at trial, requested instead a penalty of $336,000.00. The United States alleges that the amount represents the economic benefit Sheyenne obtained by noncompliance, and an additional penalty of approximately $100,-000.00. At closing argument the United States suggested that was a reasonable amount because it represents a mere $.03/$1.00 of the maximum penalty which could be levied against Sheyenne. Both parties presented questionable figures concerning the economic benefit to Sheyenne. This Court will utilize the statutory factors contained within Section 309(d), 33 U.S.C. § 1319(d), in determining the penalty to be assessed.

In the course of preparation for trial the following issues were resolved:

1. Liability of the defendant was established under the Act, 33 U.S.C. §§ 1317 and 1318, and the pretreatment regulations promulgated thereunder.

2. The affirmative defenses of laches and equitable estoppel against the United States were denied as a matter of law.

The disclosures and admissions of the defendant did establish that the defendant had committed the violations claimed. That is, it was established before trial that:

1. Sheyenne failed to submit a baseline monitoring report (BMR) as required by 40 C.F.R. § 403.12(b).

2. Between April 1993 and November 1993, Sheyenne did, at least occasionally, exceed the monthly average effluent limitations for zinc.

3. Sheyenne failed to submit 90–day compliance reports as required by 40 C.F.R. § 403.12(d).

4. Sheyenne failed to submit periodic compliance reports every July and December, beginning July, 1986, but did begin to submit periodic reports in May, 1993.

5. Sheyenne periodically failed to sample, analyze and report on its regulated waste water streams for, *inter alia*, zinc, prior to the wastewater discharges to the Cooperstown POTW in violation of 40 C.F.R. §§ 433.15 and 403.12(g).

These failures carry a maximum penalty of $25,000.00 per day.

■ We begin our consideration of this case by recognizing that failure to know the law is no excuse; that federal regulations properly created and published are the law, and that these regulations were properly created and published.

■ Once the factual issue of violation, and concomitantly, of liability, is established, the district court is charged with the task of assigning the penalties to be assessed under the Act. In so doing, the court is granted great discretion in affixing the price of the penalty that the defendant shall pay, as is evidenced both by the language of the Act, as drafted by Congress, and by light shed upon such determinations, as enumerated by the Supreme Court in *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), where the Court stated,

> Congress [made the] assignment of the determination of the amount of civil penalties to trial judges.... Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges. In this case, highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act.

*Id.*, 481 U.S. at 426–27, 107 S.Ct. at 1839. As indicated by the language in *Tull v. United States supra*, the product of the court's exercise of discretion under the Act, must be shaped by considerations contained within the Act; it is not a wholly unconstrained discretion that is contemplated by the Act.

It must be understood, however, that despite the directional aid and guidance that the six enumerated factors in § 1319(d) provide, the calculation of a final penalty may often be imprecise and approximate at best.

Indeed, the accuracy of the final calculations, and the figure of penalty that they produce, is as dependant, or even more so, upon the provision of complete and accurate evidence, as introduced, developed, and explained at trial, as it is upon a good evaluation of this information by the court. · In the context of a district court's calculations of economic benefit and its weighing of the objective evidence, or its resolving of doubts over the accuracy of studies, tile Court of Appeals for the Fifth Circuit, in *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996), has noted, as to these imprecise and subjective measurements, that "most importantly, . . . a court need only make a 'reasonable approximation' of economic benefit when calculating a penalty under the CWA" *Id.* at 576 (citing *Public Interest Research Group v. Powell Duffryn Terminals*, 913 F.2d 64, 80 (3rd Cir.1990)) (citing S.Rep. No. 50, 99th Cong., 1st Sess. 25 (1985)).

In determining the amount of the civil penalty, pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), the court shall consider,

1. the seriousness of the violations;
2. the economic benefit resulting (to the violator) from the violations;
3. any history of such violations;
4. any good faith efforts to comply with tile applicable requirements;
5. the economic impact of the penalty on the violator;
6. such other matters as justice may require.

Plaintiff therefore undertook by its evidence to show,

1. that Sheyenne's conduct was seriously damaging to tile environment;
2. that Sheyenne gained an unlawful and unfair benefit as against other potential polluters by not maintaining waste disposal until compelled to by the EPA;
3. that Sheyenne has an extended history of violations; and
4. what efforts, if any, Sheyenne took to comply with the applicable regulations.

The EPA abandoned its effort to show damage to the environment, and instead concentrated on Sheyenne's failure to comply with the regulation.

## I. Background

Cooperstown is the county seat of Griggs County, North Dakota. It is a city of 1200 residents, according to the 1990 census. It is about six miles west of the Sheyenne River, which is a navigable water of the United States, 33 U.S.C. § 1362(7), and a Class I waterway of the State of North Dakota.

The defendant, Sheyenne, is a North Dakota corporation and a metal production facility located in Cooperstown. The corporation has three stockholders: Stokkeland, Broten, and Larson. Curt Stokkeland is the founder and general manager. Broten assists in management, and has available finds for the corporation, if necessary. Larson is the accountant, and with Mrs. Stokkeland, handles the office administration.

Sheyenne empties its industrial waste through the city sewage system into the Cooperstown sewage treatment plant, which in turn, discharges its treated waters into an intermittent, Class III waterway of North Dakota. That waterway eventually drains into the Sheyenne River. Sheyenne is therefore a source of "indirect discharge" within the meaning of Section 306(a) of the Act and 40 C.F.R. § 403.3(g), and also an "industrial user" as defined in 40 C.F.R. § 403.3(h).

Curt Stokkeland was originally a tool and dye maker for Melroe Tractor Company. When Melroe left Cooperstown, Stokkeland began his business in 1978. It was started in an abandoned Ford Garage building; and in about two years the electroplating operation began. Five years after he began, the city gave him the abandoned Melroe building on the condition that he would repair and maintain it, and he moved his business, including the electroplating facility, into that building. In about 1994, he expanded the Melroe building and again moved his electroplating business to a new, outside-walled section. Until the 1994 move, he simply transferred and expanded his old machinery.

Sheyenne's original plating operation was small. Along with occasional weekly stand-downs, it generally plated for two or three days per week. In 1990, Sheyenne had thirty employees, and by 1996, it had about sixty-five employees. Sheyenne is holding back on expansion plans until the outcome of this lawsuit is established.

In 1986, Sheyenne had one contact from the EPA. It furnished the report demanded and then "forgot about it." The management did not know about the requirements for other reports or for periodic testings to assure an allowable level of pollutants in the waste stream. In fact, on about August 8, 1995, Donna K. Inman, an environmental scientist in the water enforcement group of the EPA, observed, "they didn't know the laws were out there." Sheyenne is now in compliance.

## II. The EPA's Position

Plaintiff's first witness, George C. Cushnie, Jr., testified that Sheyenne began electroplating in 1979, and used the same process for execution and waste disposal from 1979 to 1993. From January to December 1993, Sheyenne was attempting to come into compliance with EPA standards, and did so by December 1993.

The witness testified that the waste water volume during the noncompliance period in 1993 was 14,000 to 15,000 gallons per day. The witness explained that the move from the Ford garage to the Melroe building, and the move within the Melroe building, were both transfers of equipment, and that even had there been no changes in the process, nonetheless each transfer amounted to a "new installation." And as a new installation the regulations required a new BMR, which Sheyenne failed to file.

Ms. Inman is an environmental scientist in the water enforcement group. She was assigned to the Sheyenne case as an environmental scientist in February 1993. Upon demand by her, in an order dated April 1993, Sheyenne responded with its declaration to comply with the terms of that order. She testified that while Sheyenne had to request a few extensions as to reports, Sheyenne did cooperate in the EPA's efforts to require

compliance. It was in tile period of Sheyenne's attempting compliance, that Ms. Inman observed something to the effect that, "they didn't know the laws were out there." She testified at the time of trial that, "they are now in compliance."

Robert Brobst is an environmental engineer for the EPA. He described at a theoretical level the type of damage to the environment which could develop from a metal crafting and plating operation. Bit he had never even inspected the plant or the drainage system about which he was testifying, and, of course, the EPA had abandoned any claim to actual damage to the environment.

William Willingham is a research biologist with the laboratory group of the E.P.A. It was his opinion that the discharge of zinc by Sheyenne into the Cooperstown lagoon has the potential for causing either acute or chronic toxicity effects to the aquatic life in the Class III stream bed into which Cooperstown drained its POTW and possibly to the aquatic life in the Sheyenne River. Mr. Willingham also had not seen Cooperstown or its environs.

Mr. Fagan is a civil and an environmental engineer and has a Juris Doctor. He is now a lawyer. He is presently associated with the Northbridge Environmental Management Consultants. He has fifteen years of experience of financial analysis for environmental compliance. He offered the following opinions:

1. Any penalty imposed must seek to "level the playing field;" that is—accept a financial burden equivalent to that burden of compliance which was met by those other businesses or persons who did comply—plus the gain in interest or other benefits which the noncomplier harvested by its use of the money. He also reasoned that in addition to "leveling the playing field," the noncomplier must be subjected to a penalty, else the noncompliance carries no punitive restraint.

2. The unfair benefits accruing to Sheyenne by virtue of its delayed compliance amounted to $236,000.00.

The witness also concluded Sheyenne had immediately available to pay the penalty a cash account of $405,000.00.

### III. Sheyenne's Position

Ronald A. Berge testified that he is sixty-five years old, has a bachelor's degree in mechanical engineering, fanned from 1972 to 1987, and then was employed by Sheyenne. He first encountered the EPA in December 1992. His first task with them was to fill out "some type of questionnaire." When other reports were required lie filled them out. He spent a total of about 130 hours to get into compliance. It took five to ten hours to prepare the first BMR.

He testified that in three years Sheyenne accumulated about 400 kilograms of sludge and understood that as long as the accumulation of sludge is less than 1000 kilograms it can be kept indefinitely. He also testified that a quarterly report takes about forty-five minutes to complete.

Also, when the order to comply came they decided to fill enough of their principal customer's demands to keep him working about two weeks before they tore their equipment down. Filling that order took about one week.

Mr. Berge explained that until the new equipment was installed, the company could only measure the plating room wastewater flow by using a small pail and counting the number of times it filled in a day. Thus the early reported flow patterns reflected total flow from all units of the plant including, for example, toilets. And the total shop flow averaged about 1600 gallons per day.

Roger Nelson had been a farmer and is a Class A welder. He was employed by Cooperstown in 1977. In about 1983 he became Water Superintendent of the City. Cooperstown has no storm sewer system, only a sanitary sewer system. The Class III stream which drains from Cooperstown to Sheyenne is, in the summer, completely dry.

Dr. Jay Leitch, professor of economics at the University of North Dakota, has a masters of science degree in natural resource management and a doctorate in applied economics, and another doctorate in agricultural economics. He is also a certified wetland scientist. His memberships include the Association for Impact Assessment and the Society of Wetland Scientists. He was the associate director of the North Dakota Water Resources Institute.

He found three sources of potential unjustified benefit arising from a failure to comply with the EPA mandates. They were:

1. savings of money from not making a required capital investment;

2. savings from not "doing" the operation and maintenance (O & M) costs associated with those capital investments during the period they were not constricted; and

3. savings from not doing the requisite monitoring and reporting.

He reviewed the years 1990 through 1995. The period of savings development he used was August 1990 to the time of compliance in late 1993. Thereafter, he carried the savings through December 1996.

He computed the total savings as $12,564.00, including in that sum interest at the rate of 9% from August 1990 through December of 1993. He explained the difference between his figures and Mr. Fagan's as being caused by:

1. Plaintiff's witness began his computations as of 1 986 and lie began his computation from 1990.

2. Also, Mr. Fagan's capital costs excluded the actual capital costs as reported by Sheyenne, i.e. $20,000.00 as against $14,000.00.

3. Mr. Fagan used the O & M costs as $15,000.00 per year. Sheyenne's actual costs were $4600.00 per year.

4. The witness put reporting costs in his O & M costs, but Mr. Fagan had used a separate entry of $1122.00 for reports.

5. He estimated Sheyenne had an amount equal to one and one-half months of operating expense with which to pay any penalty. He found that Sheyenne's money was tied up in a loan to a stockholder farmer and that loan was not liquid money.

6. Mr. Leitch used the figures Sheyenne furnished, while the plaintiff's witness used generalized averages.

### IV. Findings and Order for Judgment

 This Court, after a review of the files, records, transcripts, and evidence received in this matter, finds as follows:

Sheyenne Tooling and Manufacturing Company, Inc., was not in compliance with the Clean Water Act, 33 U.S.C. §§ 1317, 1318, and 1319, and the Federal Regulations issued by the Environmental Protection Agency from approximately December 1, 1983, through December 1, 1993, a period of 3650 days. While the failure to comply with the laws and regulations was not deliberate or malicious, it was unlawful and the defendant is liable for every day of such violation. Further, despite the fact that the defendant's wrong is a matter of inadequate advice and management, rather than deliberate wrongdoing, the defendant must receive sufficient punishment to alert other wrongdoers to the importance of obeying the laws and regulations.

■ This Court also finds that the principle of requiring that persons at fault must be held to a "level playing field" means that the defendant must be held to the conditions of his field, not that of larger or more wealthy players. And the economic experts for the United States used averages and generalizations which were not compatible with the playing field in which the defendant operated. It must be recognized that the defendant's playing field was a small playing field in a sparsely-settled community. For these reasons I find that:

1. the defendant did violate the laws and regulations of the Clean Water Act from December 1, 1983, through December 1, 1993; and

2. the defendant is assessed as penalty for those violations:

| | | |
|---|---|---|
| (1) | $1.00 per day for every day the defendant was in violation: | $ 3650.00; |
| (2) | the amount of economic benefit which the defendant improperly received, $4600.00 per year for 10 years: | $46,000.00; |
| (3) | no amount is assessed for deliberate or malicious violation; | |
| (4)(a) | a penalty for failure to obey the regulations must be imposed: | $10,000.00; |
| (b) | a penalty for electroplating for a period of one week after notice to comply with the E.P.A. mandate, $100.00 per day for a period of 5 plating days: | $ 500.00; |

| | | |
|---|---|---|
| (5) | a factor in the mild penalty imposed under "1" is the absence of bad faith on the part of the defendant; and | |
| (6) | justice requires that the defendant, dependant as it is on a narrow base of only a few customers, should not be overburdened lest it be forced to retrench and reduce its work force—thus injuring innocent people. | |

Therefore **IT IS ORDERED THAT:**

A final penalty shall be assessed at: $60,150.00.

Let judgment be entered accordingly.
Dated this 30th day of December 1996.