# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2819

_____

| | | |
|---|---|---|
| Service Oil, Inc., | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of an |
| v. | * | Order of the Environmental |
| | * | Appeals Board. |
| United States Environmental | * | |
| Protection Agency, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: May 13, 2009
Filed: December 28, 2009

_____

Before LOKEN, Chief Judge, BYE, Circuit Judge, and MILLER,* District Judge.

_____

LOKEN, Chief Judge.

Congress substantially amended the Clean Water Act in the Water Pollution Control Act Amendments of 1972, directing the Environmental Protection Agency (EPA) to adopt effluent limits for the discharge of various pollutants, and providing that "it is illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit" that incorporates those effluent limits. City of Milwaukee v. Illinois & Mich., 451 U.S. 304, 311-12 (1981); see generally S. Rep. No. 92-414

_____

*The HONORABLE BRIAN STACY MILLER, United States District Judge for the Eastern District of Arkansas, sitting by designation.

(1972), reproduced in 1972 U.S.C.C.A.N. 3668, 3675-77, 3708-39.  The Water Quality Act of 1987 expanded this regime by directing EPA to require permits for storm water discharges associated with industrial activity.  See 33 U.S.C. § 1342(p)(2)-(4).  In this administrative enforcement proceeding, EPA imposed a substantial monetary penalty on Service Oil, Inc., the owner of a construction site that did not timely obtain a storm water discharge permit.  EPA based the amount of the penalty not on unlawful discharges, but on Service Oil's failure to comply with the agency's permit application regulations.  Concluding that this is an expansion of EPA's remedial power not authorized by the governing statutes, we reverse and remand for redetermination of the penalty.

## I.

The Clean Water Act prohibits the discharge of any pollutant into navigable waters from a point source except in compliance with an NPDES[1] permit issued by EPA or by an authorized state agency.  See 33 U.S.C. §§ 1311(a), 1342(a), 1362(12); Nat'l Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 583 (6th Cir. 1988).  EPA's regulations provide that one intending to discharge "storm water associated with industrial activity" must apply for an individual NPDES permit, or for coverage under a "promulgated storm water general permit."  40 C.F.R. § 122.26(c)(1).  "Industrial activity" includes "[c]onstruction activity . . . except operations that result in the disturbance of less than five acres of total land area."  40 C.F.R. § 122.26(b)(14)(x).  EPA's permit regulations provide that operators of facilities described in § 122.26(b)(14)(x) shall submit permit applications at least ninety days before the start of construction, or when required by an applicable general permit.  40

---

[1]NPDES is an acronym for National Pollution Discharge Elimination System.

C.F.R. §§ 122.21(c)(1), 122.26(c). The North Dakota Department of Health, an authorized state agency, has issued a general permit applying to new and existing discharges of "storm water associated with construction activity." The general permit provides that, to obtain coverage, an operator "shall submit" a Notice of Intent and a Stormwater Pollution Prevention Plan thirty days prior to the start of construction.

In April 2002, Service Oil began construction of a Stamart Travel Plaza on more than five acres of land in Fargo, North Dakota. When construction began, the site became a "point source." See 33 U.S.C. § 1362(14). A point source lacking a permit is subject to the core Clean Water Act prohibition -- "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The parties stipulated that storm water contains "pollutants." See 33 U.S.C. § 1362(6). "Discharge of a pollutant" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The site's storm water discharges flow through Fargo's storm sewer system into the Red River of the North, part of the navigable waters of the United States. See 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

In October 2002, EPA and state Department of Health officials inspected thirteen construction sites in the Fargo area. Twelve, including Service Oil's Stamart site, lacked an NPDES permit or coverage under the Department of Health's general permit. Service Oil submitted a Notice of Intent to the Department and obtained coverage under its general permit. State officials closed their review in June 2004 without further action. EPA continued its review, ultimately concluding that Service Oil had not fully complied with the NPDES permit because it failed to conduct site inspections every seven days and after heavy storms and to record inspection results in a Site Inspection Record. This administrative enforcement action followed.

The Clean Water Act includes a variety of enforcement provisions found primarily in 33 U.S.C. § 1319. See generally Tull v. United States, 481 U.S. 412 (1987). Section 1319(g)(1) authorizes EPA to assess a civil monetary penalty if it

"finds that any person has violated [33 U.S.C. §§] 1311, 1312, 1316, 1317, 1318, 1328, or 1345," or has violated a condition in an NPDES permit issued under § 1342. In this case, EPA's Complaint sought an $80,000 administrative penalty, alleging that Service Oil violated 33 U.S.C. §§ 1311(a) and 1342(p), and 40 C.F.R. § 122.26(c) by not obtaining a permit prior to commencing construction (Count 1), and by failing to comply with the permit's terms once issued (Count 2).

After Service Oil answered, EPA moved for accelerated decision (summary judgment). The ALJ denied summary judgment on Count 1, concluding that the failure to obtain an NPDES permit does not violate § 1311(a) absent proof of a discharge, and Service Oil disputed whether any discharge occurred after construction began but before it obtained coverage under the Department of Health's general permit. The ALJ noted that the regulations require a new storm water discharger to apply for a permit before construction, and therefore a statutory provision listed in 33 U.S.C. § 1319(g)(1) other than § 1311 "may provide a statutory basis for an enforcement action for failure to apply for a storm water permit as required by 40 C.F.R. § 122.26(c)." The ALJ granted summary judgment on Count 2 -- it was undisputed that Service Oil violated conditions of the general permit after obtaining coverage -- but denied summary judgment on the question of penalty.

EPA then amended Count 1 to allege that Service Oil's failure to apply for a storm water discharge permit before commencing construction violated 33 U.S.C. § 1318 and 40 C.F.R. § 122.21. Service Oil opposed the amendment, arguing that § 1318 does not apply to the agency's permit application regulations, thereby preserving this *issue of law* for judicial review. After a hearing, the ALJ concluded that § 1318's record-keeping requirements encompass agency regulations requiring the pre-construction submission of a completed permit application. As a violation of § 1318 is enforceable under § 1319(g)(1), the ALJ concluded that Service Oil is liable on Count 1 regardless of whether EPA proved that a discharge occurred prior to obtaining coverage under the general permit. After a lengthy review of conflicting

expert testimony, the ALJ further found that "dirt, sediment and concrete, did flow off-site during construction" and "would have reached the Red River." Therefore, Service Oil also violated § 1311(a) by discharging pollutants without a permit.

Applying the penalty factors mandated by 33 U.S.C. § 1319(g)(3),[2] the ALJ assessed a $35,640 penalty for all violations. The ALJ began the penalty analysis by assessing Service Oil for the "rather nominal economic benefit" of $2700 it obtained from non-compliance (delayed and avoided compliance costs). The ALJ then increased the penalty to $27,000 based on Service Oil's "complete failure to apply for and obtain a NPDES permit prior to starting construction." The ALJ increased the $27,000 penalty by ten percent because Service Oil, "albeit however slightly, had certainly caused the Red River to become more impaired," and increased the penalty another twenty percent to reflect Service Oil's culpability. On appeal, the Environmental Appeals Board (EAB) affirmed the ALJ's § 1318 analysis and the penalty assessed, specifically upholding a ten-fold increase in the base economic benefit penalty because of Service Oil's "complete failure to apply for its storm water permit prior to starting construction." In re Service Oil, Inc., CWA Appeal No. 07-02, Final Decision & Order at pp. 34-35 (EAB July 23, 2008).

Service Oil petitions for review of the EAB's final agency action, renewing its argument that failure to apply for an NPDES permit prior to construction in the time prescribed by EPA's permit regulations does not violate § 1318 and therefore cannot be the basis of a civil monetary penalty under § 1319(g)(1). Service Oil concedes that it is subject to an administrative penalty for its minimal storm water discharges prior

_____

[2]§ 1319(g)(3) provides in relevant part: "In determining the amount of any penalty assessed under this subsection, the Administrator . . . shall take into account the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require."

to obtaining coverage under the general permit, and for failing to conduct required site inspections after it obtained permit coverage. We review the penalty assessment for abuse of discretion. See 33 U.S.C. § 1319(g)(8). The amount of the penalty assessed, which must be determined in accordance with § 1319(g)(3), was based primarily on the failure to apply for a permit prior to starting construction, as required by the EPA regulations. If that failure was not a violation of § 1318, triggering liability for an administrative monetary penalty under § 1319(g)(1), the penalty was based upon an impermissible factor and must be reversed. See, e.g., Kelly v. EPA, 203 F.3d 519, 523 (7th Cir. 2000) ("An abuse of discretion by an agency involves . . . a decision that rests on an impermissible basis."). We review EPA's interpretation of § 1318 under the familiar standards of Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984).

## II.

The Clean Water Act prohibits discharges without a permit. 33 U.S.C. § 1311(a). NPDES permits prescribe effluent limitations and pretreatment standards that will apply to the permit-holder's discharges. See §§ 1312, 1317, 1342(a)(1). EPA and state permitting authorities obviously need detailed data from a new point source applicant in order to fashion and issue an appropriate permit *before discharges commence*. EPA's regulations governing permit applications serve this purpose. See Natural Resources Defense Council v. E.P.A., 822 F.2d 104, 111 (D.C. Cir. 1987) ("the comprehensive NPDES regulations are pivotal to implementation of the Clean Water Act's permit scheme").

The 1972 Clean Water Act amendments authorized EPA to "prescribe such regulations as are necessary to carry out [its] functions under this Act." Pub. L. 92-500, § 501(a), 86 Stat. at 885, codified at 33 U.S.C. § 1361(a). Indeed, Congress included this broad rule-making authority in the very first federal water pollution control act, enacted in 1948. See Pub. L. 845, ch. 758, § 9(d), 62 Stat. 1155, 1160

(1948). The 1987 Water Quality Act included specific authority to issue regulations governing industrial stormwater discharge permits. Pub. L. 100-4, § 405, 101 Stat. 7, 69, codified at 33 U.S.C. § 1342(p)(6).

EPA first issued regulations specifying the timing and content of NPDES permit applications in 1972 and 1973. The agency issued substantially revised regulations in 1979 and 1983, and added regulations governing applications for storm water discharge permits in 1990. As one would expect, each set of regulations has provided that permit applications for a proposed point source must be submitted prior to the initial discharge.[3] EPA has consistently cited the entire statute as its authority for these regulations See 44 Fed. Reg. at 32,899; 55 Fed. Reg. at 48,062 (citing "Clean Water Act, 33 U.S.C. 1251 *et seq.*"). Regulations governing the timing and content of permit applications are clearly within the broad rule-making authority delegated by 33 U.S.C. § 1361(a).

The issue in this case is one of remedial power, not regulation validity. Congress in § 1319(g)(1) granted EPA limited authority to assess administrative monetary penalties for violations of specific statutory provisions related to the core prohibition against discharging without a permit, or contrary to the terms of a permit. The agency may not impose those penalties for violations of other Clean Water Act regulatory requirements, though it may be authorized to take other enforcement action by other subsections of § 1319. One of the specified statutes is § 1318(a), which authorizes the EPA Administrator, "when required to carry out the objective of this chapter," to "require the owner or operator of any point source" to (i) establish and maintain records, (ii) make reports, (iii) install and use monitoring equipment, (iv)

_____

[3]See 37 Fed. Reg. 28,390, 28,393, § 124.21(b) (Dec. 2, 1972) (requirements for state permit programs); 38 Fed. Reg. 13,528, 13,531, § 125.12(c) (May 22, 1973) (EPA-issued permit requirements); 44 Fed. Reg. 32,854, 32,903, § 122.10(c) (Jun. 7, 1979); 48 Fed. Reg. 14,145, 14,159, § 122.21(c) (Apr. 1, 1983); 55 Fed. Reg. 47,990, 48,062, § 122.21(c) (Nov. 16, 1990).

sample effluents, and (v) "provide such other information as he may reasonably require." It also authorizes EPA representatives to enter any premises where an effluent source is located or records are kept, and to copy records, inspect monitoring equipment, and sample effluents. § 1318(a)(A) and (B). The Clean Water Act provides that NPDES permits must include comparable inspection, monitoring, entry, and reporting requirements. See 33 U.S.C. § 1342(b)(2)(B). These provisions were based upon a finding by Congress that the prior Federal water pollution control program "suffers from a lack of information concerning dischargers, amounts and kinds of pollution, abatement measures taken, and compliance." S. Rep. No. 92-414, 1972 U.S.C.C.A.N. at 3673.

Though § 1318(a) is broadly worded, it is clearly aimed at ensuring proper and effective recording, monitoring, and sampling of *discharges* of pollution. See generally NRDC, 822 F.2d at 118-21. Much of the information required of permit applicants would fall within its literal terms. See United States v. Allegheny Ludlum Corp., 366 F.3d 164, 175 (3d Cir. 2004). But the issue here is whether the failure to submit a timely permit *application* is a violation of § 1318(a). The regulations require that a person "proposing a new discharge," such as Service Oil in this case, "shall submit an application . . . before the date on which the discharge is to commence." 40 C.F.R. §§ 1221(c)(1), 122.26(c). Failure to comply with that requirement *cannot* be a violation of § 1318(a) because that statute's record-keeping requirements are expressly limited to "the owner or operator of any point source." Before any discharge, there is no point source. Thus, the obvious authority for EPA's permit application regulations was its general rule-making authority under § 1361(a), not its authority in § 1318 to require record-keeping by existing point sources. The plain meaning of § 1318(a) is controlling and resolves the issue. See Chevron, 467 U.S. at 842-43. "We consider the agency's interpretation only after finding that [the] statute is silent or ambiguous on the question at issue." In re Lyon County Landfill, 406 F.3d 981, 984 (8th Cir. 2005).

The Clean Water Act contains other provisions confirming that the agency's authority to assess monetary penalties by administrative proceeding is limited to unlawful discharges of pollutants. Permits for storm water discharges associated with construction activity "shall meet all applicable provisions of this section and section 1311." 33 U.S.C. § 1342(p)(3)(A). Section 1311 prohibits discharges "[e]xcept in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title." There is no cross reference to § 1318 in § 1311, only to § 1342. EPA cannot assess monetary penalties under § 1319(g) for a violation of § 1342 until a permit issues. As the Second Circuit held in invalidating a portion of EPA's regulations governing concentrated animal feeding operations, "unless there is a 'discharge of any pollutant,' there is no violation of the Act, and point sources are, accordingly, neither statutorily obligated to comply with EPA regulations for point source discharges, nor are they statutorily obligated to seek or obtain an NPDES permit." Waterkeeper Alliance, Inc. v. E.P.A., 399 F.3d 486, 504 (2d Cir. 2005). While acknowledging "the policy considerations underlying the EPA's approach," the court concluded that "it contravenes the regulatory scheme enacted by Congress; the Clean Water Act gives the EPA jurisdiction to regulate and control only *actual* discharges -- not potential discharges, and certainly not point sources themselves." Id. at 505 (emphasis in original). Accord NRDC, 822 F.2d at 128 n.24 ("The Act does not prohibit construction of a new source without a permit . . . . The Act only prohibits new sources from discharging pollutants without a permit, 33 U.S.C. § 1311(a), or in violation of existing NSPS standards, *id.* § 1316(e).") The same limitations apply in this case.

Our conclusion that EPA lacks statutory authority to assess administrative penalties for failure to submit a timely permit application does not mean, as the EAB posited, that the agency must either guess the identities of potential new point sources, or allow unpermitted discharges to ensue. Prudent builders know that permits do not issue overnight and that storm water discharges can happen any time after the start of construction makes the site a point source. They will apply and obtain permits before

starting construction to avoid penalties for unlawful discharge that may prove to be severe. That is the regulatory regime Congress crafted. By contrast, under the EAB's interpretation of § 1318(a), a person about to commence construction could apply to EPA for a storm water discharge permit less than the ninety days "before the date on which construction is to commence" prescribed in 40 C.F.R. § 122.21(c)(1); obtain the permit before construction commences and any discharge occurs; and still face a costly administrative enforcement proceeding and potential monetary penalties for failing to comply with the regulation. The statute is to the contrary.

The decision of the EAB based the amount of monetary penalty assessed primarily on Service Oil's "complete failure to apply for its storm water permit prior to starting construction." As a violation of the permit application regulations is not within the purview of 33 U.S.C. § 1319(g)(1)(A), this was a statutorily impermissible factor. Accordingly, we grant the petition for review, vacate the order assessing a civil penalty of $35,640, and remand to the agency for redetermination of the amount of the penalty in accordance with § 1319(g)(3) and this opinion.

_____